**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LARRY D. LINCOLN; BRAD C.
MOSBRUCKER,

    Plaintiffs - Appellants,

v.

BNSF RAILWAY COMPANY,

    Defendant - Appellee.

_____

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    Amicus Curiae.

No. 17-3120

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:15-CV-04936-DDC)**
_____

David E. Schlesinger, Nichols Kaster, PLLP, Minneapolis, Minnesota (Charles A. Delbridge and Lindsey Krause, Nichols Kaster, PLLP, Minneapolis, Minnesota; and Sean M. McGivern, Graybill & Hazlewood LLC, Wichita, Kansas, with him on the briefs), for Plaintiffs – Appellants.

David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas (Bryan P. Neal, Thompson & Knight LLP, Dallas, Texas, with him on the brief), for Defendant – Appellee.

Gail S. Coleman, Attorney (James L. Lee, Deputy General Counsel; Jennifer S. Goldstein, Associate General Counsel; and Elizabeth E. Theran, Acting Assistant General Counsel, with her on the brief), United States Equal Employment Opportunity

Commission, Washington, DC, for Amicus Curiae United States Equal Employment Opportunity Commission

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Several years after a tank car spill accident, Larry D. Lincoln and Brad C. Mosbrucker (collectively "Appellants") advised BNSF Railway Company ("BNSF") that medical conditions attributable to the accident rendered them partially, permanently disabled and prevented them from working outdoors. Upon learning of Appellants' alleged medical conditions, BNSF removed Appellants from service as Maintenance of Way ("MOW") workers purportedly due to safety concerns and because MOW work entails outdoor work. With some assistance from BNSF's Medical and Environmental Health Department ("MEH"), Appellants each applied for more than twenty jobs within BNSF during the four years following their removal from service. After not being selected for several positions, Appellants filed charges with the Equal Employment Opportunity Commission ("EEOC"), accommodation request letters with BNSF, and complaints with the Occupational Safety Health Administration ("OSHA").

Following BNSF's rejection of their applications for additional positions, Appellants filed a complaint raising claims for: (1) discrimination under the Americans with Disabilities Act ("ADA"); (2) failure to accommodate under the

2

ADA; (3) retaliation under the ADA; and (4) retaliation under the Federal Railroad Safety Act ("FRSA"). In a motion for summary judgment, BNSF raised an exhaustion defense and also challenged the merits of Appellants' claims. Relying on nearly forty years of precedent from this court, the district court concluded that filing an EEOC charge was a jurisdictional prerequisite to suit and it dismissed several parts of Appellants' ADA claims for lack of jurisdiction. The district court simultaneously granted summary judgment on the portions of the ADA claims that survived its jurisdictional ruling, concluding that Appellants neither qualified for the positions for which they applied nor established an inference of discrimination relative to BNSF's decision not to select them for the positions. As to the FRSA claims, the district court determined that Appellants failed properly to exhaust their OSHA administrative remedies relative to most of the positions to which they applied and failed to show that their engagement in protected activity contributed to BNSF's decision not to select them for positions that survived the exhaustion determination.

On appeal, Appellants, and the EEOC as amicus, ask this panel to overturn this court's precedent that filing an EEOC charge is a jurisdictional prerequisite to suit. After polling the full court, we overturn our precedent that filing an EEOC charge is a jurisdictional prerequisite to suit. Thus, we reverse the district court's jurisdictional rulings and remand Appellants' ADA discrimination and ADA failure to accommodate claims relative to some of the positions over which the district court determined it lacked jurisdiction.

Appellants also challenge the vast majority of the district court's summary judgment determinations on the merits of their claims that survived the court's exhaustion rulings. But in advancing their arguments on appeal, counsel for Appellants submitted a deficient appendix that fails to satisfy the requirements set out in Federal Rules of Appellate Procedure 10(b)(2) and 30(a)(1) and in Tenth Circuit Rule 10.3. These deficiencies impede our ability to reach firm conclusions on the viability of portions of Appellants' ADA discrimination and failure to accommodate claims and on the entirety of Appellants' ADA retaliation claims. On the position-based ADA discrimination and failure to accommodate claims for which we are able to reach a firm conclusion, we affirm in part and vacate in part. We also affirm the district court's grant of summary judgment on Appellants' FRSA claims. Finally, based on the deficiencies in the appendix submitted by Appellants, we invoke our discretion under Federal Rule of Appellate Procedure 39(a)(4) to preclude Appellants from seeking any of their appellate costs and instead permit BNSF to recover its appellate costs.

## I. BACKGROUND

### A. *Factual History*

On October 9, 2007, a BNSF tank car sprung a leak near where Appellants were working, exposing Appellants to 2-chlorobenzyl chloride. Following the tank car spill accident, Appellants attempted, for over two years, to negotiate a monetary settlement with BNSF as to the injuries they sustained from the accident. During that two-year period, Appellants continued to perform their duties as MOW workers for

4

BNSF. By May 2010, settlement negotiations broke down and an attorney representing Appellants relative to the accident sent BNSF demand letters. The demand letter on behalf of Mr. Lincoln stated that Mr. Lincoln continued to suffer from headaches, upper respiratory infections, reactive airways dysfunctions syndrome ("RADS"), nosebleeds, lesions/hormonal issues, endocrine disruption, vision issues, post-traumatic stress disorder ("PTSD"), and anxiety issues as a result of the accident. The demand letter on behalf of Mr. Mosbrucker stated that Mr. Mosbrucker continued to suffer from eye issues, respiratory issues, and PTSD as a result of the accident.

MEH received word of the demand letters, consulted with a BNSF field medical officer, and determined the medical issues alleged in the demand letters raised concerns about whether Appellants could safely perform their duties as MOW workers. Accordingly, MEH placed Appellants on medical leave pending medical evaluations. In 2010 and 2011, BNSF received correspondence from Appellants' nurse practitioners indicating Appellants could not return to their MOW positions or perform any outdoor work.[1]

---

[1] As to Mr. Lincoln, an August 2010 medical report indicated that he "should be restricted to employment indoors" due to RADS, associated respiratory issues, headaches, anxiety, and fatigue. BNSF App'x at 268. A letter based on a February 2011 visit indicated that Mr. Lincoln was "permanently disabled from his . . . regular occupation" as a MOW worker because "outdoor exposures trigger worsening rhinitis symptoms." *Id.* at 270. As to Mr. Mosbrucker, forms submitted in June and July of 2010 indicated that he suffered from "[a]nxiety—probable PTSD," might be "permanently disabled" as a result of "severe anxiety," and could not return to work until at least 2011. *Id.* at 673–74. A September 2010 letter stated "Mr. Morscher [sic] should be restricted to employment indoors." *Id.* at 713. Finally, a December 2010

5

From 2010 through at least late 2012, MEH encouraged Appellants to engage in vocational training and to pursue college degrees in the hope of qualifying and being selected for non-MOW positions at BNSF.[2] MEH also identified several positions to which Appellants might apply and helped advance their applications to the interview stage of the hiring process. Between August 2, 2010, and March 28, 2013, Mr. Lincoln submitted twenty-one job applications. BNSF did not select Mr. Lincoln for any of these positions. In July 2014, the union to which Mr. Lincoln and other BNSF railway workers belonged selected Mr. Lincoln for a Safety Assistant position, but BNSF rejected the selection. Between August 2, 2010, and November 24, 2014, Mr. Mosbrucker submitted twenty-two job applications; BNSF did not select him for any of these positions.

The positions for which Appellants applied fell into two categories—clerk positions and shop positions—with most of the shop positions being performed primarily in Building 12 of BNSF's Topeka, Kansas, railyard. Jeanne Artzer, a BNSF Human Resources employee, was the hiring manager for most or all of the positions to which Appellants applied after September 2012.

---

form stated that Mr. Mosbrucker was "unable to work outdoors in proximity to moving trains due to psychiatric reaction (anxiety/PTSD)." *Id.* at 698.

[2] BNSF offered to pay for the vocational training opportunities and for Mr. Lincoln to attend two quarters of college classes so that he could complete his college degree.

**B.**     *Pre-Litigation Procedural Events Relevant to ADA & FRSA Claims*

The following pre-litigation procedural events are relevant to either the triggering of rights or the exhaustion of administrative remedies under the ADA or the FRSA. First, on October 1, 2012, Appellants each submitted an accommodation request letter to BNSF, seeking a job placement with a restriction for only infrequent exposure to the outdoors. Both letters asked BNSF to "enter into the interactive process" and to "continue the present search for a non-MOW placement for [each of the Appellants] within BNSF." BNSF App'x at 271, 718. However, neither Appellant attached any documentation from a health professional to his accommodation request letter, as required by the form instructions. Thus, while Appellants' accommodation request letters suggested that Appellants believed they could perform the duties of a position that entailed some outdoor exposure, the only medical documentation BNSF ever received indicated that Appellants could not work outdoors at all.[3]

Second, the following administrative actions occurred relative to the EEOC. On February 10, 2013, Appellants each filed an EEOC charge. On May 7, 2015, Mr. Mosbrucker filed a second charge with the EEOC. On July 22, 2015, the EEOC issued Mr. Lincoln a right to sue letter. Meanwhile, the EEOC issued Mr. Mosbrucker right to sue letters on July 24, 2015, and on September 15, 2015.

Third, the following administrative actions occurred relative to the OSHA. On September 12, 2014, Mr. Lincoln filed a complaint with the OSHA. Meanwhile, Mr.

---

[3] On December 4, 2012, Appellants each sent a second letter requesting that BNSF engage in the interactive process. Neither Appellant attached any medical documentation to his second letter.

7

Mosbrucker filed an initial complaint with the OSHA on November 13, 2014, and an amended complaint with the OSHA on January 28, 2015.

## C.    *Procedural Events in Litigation*

Appellants initiated this action by filing a three-count complaint. Count One of the complaint alleged that BNSF violated the FRSA by retaliating against Appellants for reporting a safety concern, reporting injuries and requesting treatment, and filing complaints with the OSHA. Count Two alleged disability discrimination and a failure to accommodate under the ADA.[4] Count Three raised a claim for retaliation under the ADA. BNSF filed a motion to dismiss portions of each claim, arguing that (1) Appellants failed to exhaust their ADA administrative remedies relative to employment actions before April 16, 2012—more than 300 days before Mr. Lincoln filed his sole EEOC charge and more than 300 days before Mr. Mosbrucker filed his first EEOC charge; (2) Mr. Lincoln failed to exhaust his FRSA administrative remedies relative to employment actions occurring before March 16, 2014—more than 180 days before his OSHA complaint—or after September 12, 2014, the date of his OSHA complaint; and (3) Mr. Mosbrucker failed to exhaust his FRSA administrative remedies relative to employment actions occurring before May 17, 2014—more than 180 days before his first OSHA complaint—or after January 28, 2015, the date of his second OSHA complaint. Before the completion of briefing on BNSF's motion to dismiss, the parties resolved the motion via stipulation. After

---

[4] The parties and the district court treated Count Two as raising two separate claims, an ADA discrimination claim and an ADA failure to accommodate claim.

8

identifying the dates on which Appellants filed their respective complaints and charges with the OSHA and the EEOC, the stipulation stated that (1) Mr. Lincoln had exhausted his OSHA remedies relative to FRSA claims arising between March 16, 2014, and September 12, 2014; (2) Mr. Mosbrucker had exhausted his OSHA remedies relative to FRSA claims arising between May 17, 2014, and September 12, 2014; and (3) both Appellants had "exhausted their [EEOC] administrative remedies for employment actions occurring on or after April 16, 2012." App. App'x at 29–30.

The case proceeded through discovery to the summary judgment stage. In moving for summary judgment, BNSF advanced a new exhaustion defense, contending that Mr. Lincoln failed to exhaust his ADA administrative remedies relative to employment actions occurring after he filed his EEOC charge and that Mr. Mosbrucker failed to exhaust his ADA administrative remedies relative to employment actions occurring between February 11, 2013—the date of his first EEOC charge—and July 1, 2014—300 days before he filed his second EEOC charge. In support of this argument, BNSF noted that "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to bringing a lawsuit in federal court under the ADA." BNSF App'x at 86 (citing *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1310, 1317 (10th Cir. 2005)). Separately, BNSF contended that each of the Appellants' claims failed on the merits, raising arguments including: (1) Appellants were not qualified for any of the positions to which they applied; (2) BNSF hired more qualified applicants for each position such that Appellants failed to advance sufficient evidence to permit the inference that BNSF's hiring decisions were the result of discrimination; and (3) the individuals involved in the

9

hiring process did not know that Appellants engaged in protected activity for purposes of Appellants' FRSA claims.

The district court granted BNSF's motions for summary judgment, dismissing all of Appellants' claims. In granting the motions, the district court concluded that Appellants failed to exhaust their administrative remedies relative to some of the positions and that their claims based on the positions on which they had exhausted their administrative remedies lacked merit. On appeal, Mr. Lincoln raises arguments challenging the entirety of the district court's summary judgment ruling. Meanwhile, Mr. Mosbrucker challenges the entirety of the district court's ruling, except for the dismissal of his ADA claims based on the clerk positions and the dismissal of his FRSA claims based on positions other than his November 26, 2014, application for the Mechanical Shop Laborer position. Rather than summarize the district court's conclusions and the parties' arguments here, we summarize them when addressing each claim. Our task is complicated, however, because the district court's conclusions, as well as the Appellants' arguments, rely on evidence and documents not included by Appellants in the appendix they submitted in this court.

## II. STANDARD OF REVIEW

We review the district court's rulings on summary judgment de novo, applying the same standard as the district court. *See Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). For purposes of summary judgment, "[t]he nonmoving party is entitled to all reasonable inferences from the record." *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). However, "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143–44. In reviewing a grant of summary judgment, "we 'need not defer to factual findings rendered by the district court.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)). Finally, "we can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1108 (10th Cir. 2009) (internal quotation marks omitted).

## III.   DISCUSSION

### A.   *ADA Claims*

#### 1. Exhaustion of Administrative Remedies

We begin by analyzing whether Appellants exhausted their administrative remedies and what effect a failure to exhaust has on a federal court's ability to consider a claim under the ADA. The answers to these questions factor into our analysis of which BNSF positions unsuccessfully sought by the Appellants we may consider when addressing the merits of their ADA claims.

11

a. *Exhaustion requirement*

"Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Section 2000e-5(e)(1) imposes the following requirement on the filing of a charge relative to the occurrence of an allegedly unlawful employment practice:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved *within three hundred days after the alleged unlawful employment practice occurred*

42 U.S.C. § 2000e-5(e)(1) (emphasis added).

"A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004) (internal quotation marks omitted). "This individual filing requirement is intended to protect employers by giving them notice of the discrimination claims being brought against them, in addition to providing the EEOC with an opportunity to conciliate the claims." *Id.* at 1195. Furthermore, "each discrete incident of [discriminatory or retaliatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*,

12

347 F.3d 1208, 1210 (10th Cir. 2003) (citing *Morgan*, 536 U.S. at 110–13). Thus, where discrete incidents of discrimination occur after an employee files an initial EEOC charge, the employee must file an additional or amended charge with the EEOC to satisfy the exhaustion requirement as to discrete incidents occurring after the initial charge. *See id.* at 1210 (finding allegations as to September 2000 reprimand and April 2001 termination unexhausted where employee filed charge in July 1999 even though September 2000 and April 2001 incidents were part of a continuing pattern of alleged unlawful action). As relevant here, each rejection of an applicant for an open position is a discrete incident of alleged discrimination for purposes of exhausting administrative remedies. *Morgan*, 536 U.S. at 114.

b. *Jurisdictional defect or affirmative defense?*

For nearly forty years, this court has steadfastly held that exhaustion of administrative remedies is a "jurisdictional prerequisite to suit." *Sampson v. Civiletti*, 632 F.2d 860, 862 (10th Cir. 1980); *see MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) ("In the tenth circuit, a plaintiff must exhaust her claims before the EEOC as a prerequisite to federal court jurisdiction over her ADA claims."); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1030 (10th Cir. 2012) ("This court has held the exhaustion requirement is a jurisdictional prerequisite to suit under Title VII."). Applying this principle to situations where additional discrete incidents of discrimination occur after a plaintiff files an initial charge with the EEOC, we have held that "federal courts lack jurisdiction over incidents occurring after the filing of an EEOC claim unless the plaintiff files a new EEOC claim or otherwise

13

amends her original EEOC claim to add the new incidents." *Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2012).

The district court accurately concluded that Mr. Lincoln failed to exhaust his administrative remedies for all job applications he submitted (1) more than 300 days before his lone EEOC charge and (2) after his lone EEOC charge.[5] Faithfully applying our precedent, the district court held it lacked jurisdiction over portions of Mr. Lincoln's ADA claims based on positions to which he applied before April 16, 2012, or after February 10, 2013. This had the effect of excluding from consideration

---

[5] Based on the arguments and evidence advanced by the parties, the district court focused on the respective dates on which Mr. Lincoln or Mr. Mosbrucker applied for each position underlying their ADA claims. But an individual applying for a position is not an action taken by the employer, nor is it an adverse or unlawful employment action. Instead, BNSF's decisions not to select Appellants for the positions to which they applied are the adverse employment actions underlying Appellants' claims. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004) (identifying not hiring an individual as an alleged unlawful employment action). Thus, the proper temporal focus of the exhaustion analysis should have been the dates that BNSF either rejected an application for a given position or the date that BNSF selected another candidate for a position to which Mr. Lincoln or Mr. Mosbrucker applied. That said, in light of the parties' arguments below and the parties' failure to contest the district court's reliance on the application dates when determining exhaustion, this finer issue regarding exhaustion is both waived and forfeited. *See ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) ("The invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt. . . . Invited error is a form of waiver, i.e., the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue."). Thus, we will rely on the application dates when conducting our exhaustion analysis to establish the scope of each claim.

14

two positions: (1) Boilermaker—applied for March 28, 2013, and (2) Mechanical Shop Laborer—applied for March 28, 2013.[6]

As to Mr. Mosbrucker, after determining that his second EEOC charge did not relate back to the date of his first EEOC charge, the district court concluded that Mr. Mosbrucker failed properly to exhaust his administrative remedies for all job applications submitted between the date of his first EEOC charge and 300 days before his second EEOC charge. Thus, the district court held it lacked jurisdiction over portions of Mr. Mosbrucker's ADA claims based on positions to which he applied between February 10, 2013, and July 11, 2014. This had the effect of excluding from consideration four positions: (1) Boilermaker—applied for March 28, 2013; (2) Mechanical Shop Laborer—applied for March 28, 2013; (3) Mechanical Shop Laborer—applied for August 21, 2013; and (4) Part Time Analyst/Senior Analyst—applied for August 31, 2013.

On appeal, Appellants urge this panel to depart from this court's long-standing precedent that filing an EEOC charge is a jurisdictional prerequisite to suit. In their opening brief, Appellants contend that our precedent (1) cannot be squared with *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982); (2) is no longer in line with the decisions of other circuits; and (3) has been questioned by other panels of this

---

[6] The district court's jurisdictional ruling would have also applied to the Safety Assistant position—appointed by the union in July 2014. However, Mr. Lincoln, in responding to BNSF's motion for summary judgment, did not characterize his ADA claims as including the Safety Assistant position and stated that BNSF's rejection of his appointment to the Safety Assistant position went to his FRSA claim. *See* Section III(A)(3)(b)(i)(2)(c); *see also* BNSF App'x at 931–32.

court. BNSF does not defend the reasoning of our precedent, arguing only that we, as a panel of this court, are bound by it.

BNSF is correct that "one panel of the court cannot overrule circuit precedent." *United States v. Walling*, 936 F.2d 469, 472 (10th Cir. 1991). "Absent an intervening Supreme Court or en banc decision justifying such action, we lack the power to overrule [a prior panel decision]." *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996). A Supreme Court decision is "intervening" if it "is contrary to or invalidates our previous analysis." *United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (internal quotation marks omitted). Although the date of a Supreme Court decision relative to this court's past decisions may play a role in determining if the Supreme Court decision is an "intervening" decision, a Supreme Court decision that predates a decision of this court can still qualify as "intervening" if this court's subsequent decision did not mention or address the Supreme Court decision. *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1242 (10th Cir. 2016).

In *Zipes*, the Supreme Court confronted the issue of "whether the statutory time limit for filing charges under Title VII . . . is a jurisdictional prerequisite to a suit in the District Court." *Zipes*, 455 U.S. at 387. In addressing the issue, *Zipes* engaged in two inquires: (1) Did the jurisdictional provision of Title VII contain any language regarding the timely filing of an EEOC charge? and (2) Was the statutory provision establishing the time limit for filing an EEOC charge phrased in jurisdictional terms? *See id.* at 393–94. Answering both inquiries in the negative,

16

*Zipes* held that filing an EEOC charge within the statutory time limit established by 42 U.S.C. § 2000e-5(e)(1) was not a jurisdictional prerequisite to suit. *Id.* at 392–94. Instead, a plaintiff's failure to file a timely EEOC charge permits a defendant only an affirmative defense, a defense subject to waiver, estoppel, and equitable tolling. *See id.* at 392, 398.

The statutory language establishing the time limit to file an EEOC charge is the same language that imposes a duty on the plaintiff to file an EEOC charge before bringing suit. *See* 42 U.S.C. § 2000e-5(e)(1). And nothing in the provision authorizing federal courts to take jurisdiction over ADA claims contains a requirement that a plaintiff exhaust his administrative remedies before filing suit. *See* 42 U.S.C. § 2000e-5(f)(3).[7] Thus, at first blush, *Zipes* appears to qualify as an intervening decision that permits a panel of this court to overrule our prior precedent.

But the Supreme Court decided *Zipes* in 1982. Fourteen years later, in *Jones v. Runyon*, 91 F.3d 1398 (10th Cir. 1996), a panel of this court considered whether *Zipes* defeated our precedent. Although recognizing that other circuits had relied on *Zipes* to hold that the filing of an EEOC charge is not a jurisdictional requirement, *Jones* concluded that *Zipes* pertained only to the timeliness of an EEOC charge. Thus, we concluded in *Jones*, that *Zipes* did not supersede our precedent that the filing of an EEOC charge was a jurisdictional prerequisite to suit. 91 F.3d at 1399

---

[7] The jurisdictional provision governing Title VII claims also serves as the operative jurisdictional provision for ADA claims. *See* 42 U.S.C. § 12117(a) ("The powers, remedies and procedures set forth in section[] . . . 2000e-5 . . . of this title shall be the powers, remedies, and procedures this subchapter provides . . . to any person alleging discrimination on the basis of disability. . . .").

n.1. As such, *Jones* already considered and rejected the proposition that *Zipes* was an intervening decision sufficient to permit a panel of this court to reverse our precedent. We are bound by *Jones.*

The EEOC, in its role as amicus, argues that our precedent is also inconsistent with *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). Assuming that we may consider the EEOC's argument regarding *Arbaugh* even though Appellants do not cite *Arbaugh* in their opening brief, we remain unconvinced that, as a panel, we are able to overturn this court's precedent. In *Arbaugh*, the Supreme Court revisited whether statutory requirements in Title VII are jurisdictional. 546 U.S. at 503. After the jury awarded a verdict in favor of the employee, the employer filed a motion to dismiss claiming the district court lacked jurisdiction because the employer had fewer employees than the minimum necessary to impose liability under Title VII. *Id.* at 504. The district court granted the defendant's motion to dismiss and the circuit court affirmed. *Id.* at 504, 509. Applying the reasoning of *Zipes*, the Supreme Court held that the numerical qualification requirement was not jurisdictional because the requirement did not appear in Title VII's jurisdictional provision and was not expressed in jurisdictional terms. *Id.* at 511, 514–15.

While *Arbaugh* supports Appellants' position that exhaustion is not jurisdictional, it merely applied the teachings of *Zipes* to another provision in Title VII. As we have already determined that *Zipes* is not an intervening decision that permits a panel of this court to reverse our precedent, *see Jones*, 91 F.3d at 1399 n.1, it follows that *Arbaugh*, which merely applies *Zipes,* also does not qualify as an

18

intervening decision. This is particularly true where *Zipes* dealt with the specific provision governing the filing of an EEOC charge while *Arbaugh* dealt with a provision of Title VII unrelated to the filing of an EEOC charge. Therefore, neither Appellants nor the EEOC has cited an intervening Supreme Court decision that permits us, as a panel of this court, to overrule a prior panel decision.[8]

In spite of this analysis, we agree with Appellants' and the EEOC's argument that our precedent is incorrect. The jurisdictional provision of Title VII states:

> Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of Title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

42 U.S.C. § 2000e-5(f)(3). This provision makes no mention of any requirement to exhaust administrative remedies or to file an EEOC charge before bringing suit. Further, as earlier noted, the provision requiring that an ADA claimant file an EEOC

---

[8] The EEOC also argued that *Gad v. Kansas State University*, 787 F.3d 1032 (10th Cir. 2015), already overruled our precedent. We easily reject this argument. Although *Gad* significantly questioned the correctness of our precedent in light of *Zipes* and *Arbaugh*, *Gad* involved the issue of whether the requirement that a claimant verify his or her EEOC charge served as a jurisdictional prerequisite to suit. 787 F.3d at 1033, 1040. Thus, while *Gad* may be instructive regarding the state of the law after *Zipes* and *Arbaugh*, it did not hold that the filing of an EEOC charge is no longer a jurisdictional prerequisite to suit within our circuit.

19

charge, 42 U.S.C. § 2000e-5(e)(1), is the same provision that sets the timeframe for filing an EEOC charge. In fact, the language setting the timeframe for filing an EEOC charge is the only language requiring that a plaintiff, in fact, file a charge. *See* 42 U.S.C. § 2000e-5(e)(1). While § 2000e-5(e)(1) places a mandatory duty on a plaintiff to file an EEOC charge, nothing in the provision discusses a court's authority to hear a case. And, where the timeliness and filing requirement language in § 2000e-5(e)(1) is one and the same, § 2000e-5(e)(1) cannot logically be read as speaking in jurisdictional terms relative to the filing of an EEOC charge but not in jurisdictional terms relative to the timeliness of filing an EEOC charge. Thus, *Zipes*'s conclusion that the timeliness requirement is not phrased in jurisdictional terms leads to the conclusion that the filing requirement is also not phrased in jurisdictional terms.

While, as an individual panel, we cannot overrule our precedent, "[o]ne panel . . . may overrule a point of law established by a prior panel after obtaining authorization from all active judges on the court." *United States v. Meyers*, 200 F.3d 715, 721 (10th Cir. 2000). In accord with this practice, we have circulated this opinion to all active members of this court and all active, non-recused[9] members of the court have concurred with our conclusion that our precedent that the filing of an EEOC charge is a jurisdictional prerequisite to suit is no longer correct. *See e.g. Shikles*, 426 F.3d at 1317 ("Unlike many other circuits, we have held that a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit

_____

[9] Judge Hartz took no part in the consideration or vote in this matter.

20

under Title VII—not merely a condition precedent to suit."); *MacKenzie*, 414 F.3d at 1274 ("In the tenth circuit, a plaintiff must exhaust her claims before the EEOC as a prerequisite to federal court jurisdiction over her ADA claims.") *Sampson*, 632 F.2d at 862 ("Exhaustion is a jurisdictional prerequisite to suit . . . ."). Thus, the full court now holds that a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim.[10] Accordingly, we reverse the district court's jurisdictional rulings and turn to the question of whether BNSF waived its failure to exhaust defense relative to some of the positions to which Appellants applied.

c. *Impact of stipulation on BNSF's ability to raise an affirmative defense*

As noted earlier, the parties agreed to the following terms when stipulating to the resolution of BNSF's motion to dismiss portions of Appellants' claims for a failure to exhaust:

---

[10] In so holding, we bring our precedent in line with the overwhelming majority of our sibling circuits who, post-*Zipes*, have stated that a plaintiff's failure to exhaust administrative remedies before bringing a Title VII, ADA, or Age Discrimination in Employment Act claim does not deprive a federal court of jurisdiction over the claim. *Frederique-Alexandre v. Dep't of Nat. & Envtl. Res. of P.R.*, 478 F.3d 433, 440 (1st Cir. 2007); *Francis v. City of New York*, 235 F.3d 763, 766–68 (2d Cir. 2000); *Commc'ns Workers of Am. v. N.J. Dep't of Pers.*, 282 F.3d 213, 216–17 (3d Cir. 2002); *Davis v. Fort Bend Cty.*, 893 F.3d 300, 303–08 (5th Cir. 2018); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 400–01 (6th Cir. 2008); *Gibson v. West*, 201 F.3d 990, 993–94 (7th Cir. 2000); *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1130 n.2 (8th Cir. 2014); *Jackson v. Seaboard Coast Line Ry. Co.*, 678 F.2d 992, 1000–10 (11th Cir. 1982); *Douglas v. Donovan*, 559 F.3d 549, 556 n.4 (D.C. Cir. 2009) (citing *In re James*, 444 F.3d 643, 647–48 (D.C. Cir. 2006)). *But see Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 & n.2 (4th Cir. 2009).

8. Plaintiff Lincoln filed a single FRSA complaint with the Department of Labor's Occupational Safety and Health Administration ("OSHA") dated September 12, 2014.

9. Therefore, the applicable timeframe for which Plaintiff Lincoln has viable FRSA claims is March 16, 2014 through September 12, 2014.

10. Plaintiff Mosbrucker filed an original FRSA complaint on November 13, 2014 and later amended that complaint on January 28, 2015.

11. Therefore, the applicable timeframe for which Plaintiff Mosbrucker has viable FRSA claims is May 17, 2014 through January 28, 2015.

12. Plaintiffs Lincoln and Mosbrucker both filed charges with the Equal Employment Opportunity Commission ("EEOC") on February 10, 2013. Plaintiff Mosbrucker filed an amended charge with the EEOC on May 7, 2015.

13. Therefore, Plaintiffs Lincoln and Mosbrucker have exhausted their administrative remedies for employment actions occurring on or after April 16, 2012.

App. App'x at 29–30. Appellants contend that we should read Paragraph 13 as an agreement by the parties that Appellants exhausted their administrative remedies for all positions to which they applied on or after April 16, 2012. Appellants further contend that, by agreeing to Paragraph 13, BNSF waived its exhaustion defense relative to any positions to which Appellants applied on or after April 16, 2012. Because the district court concluded that the failure to file an EEOC charge was jurisdictional, it did not reach the question of whether the stipulation foreclosed BNSF's failure to exhaust defense with respect to positions to which Appellants applied on or after April 16, 2012.[11]

---

[11] Under our then-existing precedent, the failure to exhaust was jurisdictional and consequently could not be waived. *See City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) ("[B]ecause parties cannot waive subject-matter jurisdiction, they can challenge it 'at any time prior to final judgment.'"

22

In resolving a dispute, "[w]e cannot overlook or disregard stipulations which are absolute and unequivocal. Stipulations of attorneys may not be disregarded or set aside at will." *United States v. N. Colo. Water Conservancy Dist.*, 608 F.2d 422, 431 (10th Cir. 1979) (citations omitted). "Litigation stipulations can be understood as the analogue of terms binding parties to a contract." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995). Under Kansas law,[12] "[t]he primary rule in interpreting written contracts is to ascertain the intent of the parties." *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015) (quoting *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002)). Furthermore,

> [u]nambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced. The intent of the parties is determined from the four corners of an unambiguous instrument, harmonizing the language therein if possible. Ambiguity does not appear unless it is genuinely uncertain which of two or more meanings is the proper meaning.

*Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1063 (10th Cir. 1998) (ellipsis omitted) (quoting *Hall v. JFW, Inc.*, 893 P.2d 837, 840 (Kan. Ct. App. 1995)). "A contract is ambiguous if it 'contains provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.'" *BancInsure, Inc.*, 796 F.3d at 1233 (quoting *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d

---

(quoting *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004)). In contrast, under our decision today, the failure to exhaust is merely an affirmative defense subject to principles of waiver and estoppel. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[12] Appellants contend that Kansas law governs our interpretation of the stipulation and BNSF did not dispute this contention. Accordingly, we assume, without deciding, that Kansas law governs our interpretation of the stipulation.

789, 792 (Kan. 2002)). "Courts 'should not strain to create an ambiguity where, in common sense, there is none.'" *Id.* (quoting *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998)). Finally, a court should consider extrinsic or parol evidence only after it has concluded that the plain language of the contract is ambiguous. *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 827 P.2d 24, 35 (Kan. 1998).

Paragraph 13 of the stipulation states: "Therefore, Lincoln and Mosbrucker have exhausted their administrative remedies for employment actions occurring on or after April 16, 2012." App. App'x at 30. It is phrased in the absolute and constitutes an agreement between the parties that exhaustion was not an issue for any position applications or employment actions occurring on or after April 16, 2012. There is no ambiguity in this language, and the stipulation is best read as a waiver by BNSF of its exhaustion defense for all employment actions occurring on or after April 16, 2012.

In an effort to escape the plain language of the stipulation, BNSF asks us to consider (1) the context under which the parties entered into the stipulation—that the stipulation resolved a motion to dismiss ADA claims based on employment actions before April 16, 2012; and (2) its understanding of the scope of the stipulation—that, relative to the ADA claims, the stipulation resolved only the viability of claims based on positions to which Appellants applied before April 16, 2012. BNSF's understanding of the stipulation, however, constitutes parol evidence. *See Sylvia v. Wisler*, 875 F.3d 1307, 1330 (10th Cir. 2017) (defining parol evidence to include "prior or contemporaneous . . . understandings tending to vary the terms of the contract" (quoting *Decatur Cty. Feed Yard, Inc. v. Faney*, 974 P.2d 569, 574 (Kan. 1999))).

24

Thus, our conclusion that the relevant portions of the stipulation are not ambiguous precludes us from considering BNSF's understanding of the stipulation.[13] *See Barbara Oil Co.*, 827 P.2d at 35.

Having determined the clear meaning of the stipulation, we remand to the district court to decide whether to enforce its terms against BNSF. A court will not always enforce the terms of a stipulation in the rigid manner that a court typically enforces the terms of a contract. This is particularly true when a stipulation is entered into to resolve a limited matter that arises during the course of litigation. "Case law is clear that 'a stipulation of counsel originally designed to expedite the trial should not be rigidly adhered to when it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties.'" *TI Fed. Credit Union*, 72 F.3d at 928 (quoting *Marshall v. Emersons Ltd.*, 593 F.2d 565, 568 (4th Cir. 1979)). Further, "[r]elief from erroneous stipulations is especially favored where the mistake made concerns a legal conclusion," and courts "are not bound to accept as controlling, stipulations as to questions of law." *Id.* (citing *Saviano v. Comm'r of Internal Revenue*, 765 F.2d

---

[13] Even if we could consider the context in which the parties entered into the stipulation and BNSF's representation about its understanding of the stipulation, it is not apparent that BNSF's interpretation would prevail. In addition to seeking dismissal of ADA claims prior to April 16, 2012, for a failure to exhaust, BNSF's motion to dismiss raised an exhaustion defense to FRSA claims based on employment actions occurring more than 180 days prior to Appellants filing their OSHA complaints or *after* Appellants filed their OSHA complaints. Thus, while the stipulation did not specify an end date relative to ADA exhaustion, it did specify end dates with respect to FRSA exhaustion. Where an end date was included relative to FRSA exhaustion but not relative to ADA exhaustion, it arguably follows that the parties agreed that ADA exhaustion did not have an end date. *Cf. Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99–100 (1992) (considering statute as a whole and relying on language from one provision to interpret meaning of another provision).

643, 645 (7th Cir. 1985), for first phrase and quoting *Estate of Sanford v. Comm'r*, 308 U.S. 39, 51 (1939), in second phrase). Finally, we have noted that "[e]ven though a court may not overlook stipulations as a matter of course, no rule of law requires a court to base the resolution of the case on stipulations of the parties." *O'Connor v. City & Cty. of Denver*, 894 F.2d 1210, 1226 n.12 (10th Cir. 1990). Ultimately, "the district court is vested with broad discretion in deciding whether to enforce [the] parties['] stipulation or not." *Miller v. Eby Realty Grp. LLC,* 396 F.3d 1105, 1116 (10th Cir. 2005); *see O'Connor*, 894 F.2d at 1226 n.12 ("The court determines the effect, if any, of the stipulations.").

The district court had no need to consider whether it would enforce the plain language of the stipulation because it was bound by our prior precedent that some of the position-specific portions of the ADA claims failed for lack of jurisdiction. But the district court, being more familiar with the course of the motion to dismiss, as well as this litigation as a whole, is in the best position to determine what effect should be given to the stipulation. Further complicating that question is the fact that under our prior precedent, BNSF, when it agreed to Paragraph 13 of the stipulation, might not have been concerned about foreclosing an exhaustion defense because parties cannot stipulate to a court's jurisdiction over a matter. *See Ry. Co. v. Ramsey*, 89 U.S. 322, 327 (1874) ("Consent of parties cannot give the courts of the United States jurisdiction."). Finally, before this court, neither party adequately or directly briefed this issue. Accordingly, on remand of any claim the district court dismissed for lack of jurisdiction, the district court should determine, in light of cases such as

26

*TI Federal Credit Union*, *Marshall*, and *O'Connor*, what, if any, force should be accorded the stipulation.[14]

Having reached these conclusions regarding the exhaustion question, we pause to address an issue that impedes our merits review of the claims properly before us: the deficient manner in which Appellants' counsel has compiled the appendix.

## 2.  Appellants' Appendix

The Federal Rules of Appellate Procedure, this court's Local Rules, and this court's cases interpreting and enforcing compliance with both sets of rules establish clear parameters for what materials an appellant must include in the appendix. The duty to file an appendix that complies with the requirements set out by the Federal Rules of Appellate Procedure and our Local Rules falls squarely on the appellant. *Tilton v. Capital Cities/ABC, Inc.*, 115 F.3d 1471, 1474 (10th Cir. 1997); *see* Fed. R.

---

[14] In concluding that filing an EEOC charge is not a jurisdictional prerequisite to suit and that Paragraph 13 of the stipulation is properly interpreted as a waiver by BNSF of its exhaustion defense, we find it unnecessary to address Mr. Mosbrucker's alternative argument that his second EEOC charge relates back to the date of his first EEOC charge. Should the district court decide not to enforce the stipulation, it would be necessary to resolve Mr. Mosbrucker's alternative argument. Although the district court addressed this issue below, we conclude that, if necessary, the district court should reconsider the issue in light of the statement in *Eisenhour v. Weber County* that "federal courts lack jurisdiction over incidents occurring after the filing of an EEOC claim unless the plaintiff files a new EEOC claim or otherwise amends her original EEOC claim to add the new incidents." 744 F.3d 1220, 1227 (10th Cir. 2012). Although the jurisdictional aspect of *Eisenhour*'s statement is no longer valid in light of our opinion, *Eisenhour*'s reasoning may, when considered alongside 29 C.F.R. § 1601.12(b), provide guidance on whether a second EEOC charge alleging additional discrete incidents of similar employment practices relates back to the date of an earlier charge. To permit potential reconsideration of this matter, we vacate the district court's analysis of the relation back question found in Section III(A)(1)(b) of the district court's opinion.

App. P. 30(a)(1); 10th Cir. R. 30.1(b)(1). When an appellant contends the district court's findings and conclusions were contrary to the evidence presented, the appellant "*must* include in the record a transcript of *all evidence relevant to that finding or conclusion.*" Fed. R. App. P. 10(b)(2) (emphasis added). Likewise, Federal Rule of Appellate Procedure 30 states, "[t]he appellant *must* prepare and file an appendix to the briefs containing: (A) the relevant docket entries in the proceeding below . . . and (D) other parts of the record to which the parties wish to direct the court's attention." Fed. R. App. P. 30(a)(1) (emphasis added). Further, under our Local Rules, the appellant must "designate a record on appeal that is *sufficient for considering and deciding* the appellate issues." 10th Cir. R. 10.3(A) (emphasis added). Specific to the context of an appeal from the grant of summary judgment, an appellant must file an appendix that includes "all the materials considered by the district court." *Burnett v. Sw. Bell Tel., L.P.*, 555 F.3d 906, 908–09 (10th Cir. 2009) (quoting 16A Charles Alan Wright, Arthur R. Miller, Edward H. Copper & Catherine T. Struve, *Federal Practice & Procedure* § 3956.1, at 627–28 (4th ed. 2008)).

Counsel for Appellants failed to satisfy their most basic duties under these rules. Although the Appellants challenge several of the district court's conclusions as contrary to the evidence presented at summary judgment, the appendix submitted by Appellants includes very few of the evidentiary documents considered and relied on by the district court when reaching its conclusions. Despite the fact-intensive nature of a case featuring ADA claims, the appendix submitted by Appellants contains a mere 120 pages of material. Of those 120 pages, seventy-five pages comprise the

28

district court docket sheet and opinion. Another sixteen pages of the appendix consist of Appellants' complaint. And while Appellants were required to include these three items in their appendix, accounting for the pages the three items spanned, Appellants submitted a mere thirty-nine pages of evidence to support their arguments on appeal and their four different claims for relief. Materials notably absent from the appendix include (1) any of the job postings that listed the qualifications for the positions to which Appellants applied; (2) the deposition testimony of Ms. Artzer—BNSF's Federal Rule of Civil Procedure 30(b)(6) expert and the hiring manager for most or all of the positions—who discussed the qualifications for the positions to which Appellants applied; (3) evidence demonstrating that Appellants were qualified for many of the positions to which they applied; (4) evidence related to Appellants' medical conditions and ability/inability to work outdoors; and (5) any of the at least two and a half years' worth of communications from MEH to Appellants regarding training and job opportunities.

While the omissions of pertinent materials from the appendix is problematic, it is even more troubling that counsel appears to have cherry-picked the evidence most favorable to Appellants for inclusion in the appendix. Counsel's self-serving selection of appendix materials forced BNSF to choose between (1) proceeding on an appendix with materials only favorable to Appellants with the hope this court would summarily affirm the district court's decision based on the deficient appendix or (2) submitting a supplemental appendix with the proper materials, not only shouldering the expense of compiling a proper appendix but also decreasing the chances the court

29

would summarily affirm the district court's decision. BNSF admirably chose the latter option, providing an appendix that contains most of the evidence necessary to review the district court's decision.

In responding to BNSF's argument that their appendix was deficient, Appellants advanced the position that their oversight was unimportant because this court often overlooks the rules governing the appendix. But the rules governing the required contents of the appendix "are not empty gestures," *Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118, 1121 (10th Cir. 2003), and "[a]n appellant who provides an inadequate record does so at his peril," *Dikeman v. Nat'l Educators, Inc.*, 81 F.3d 949, 954 (10th Cir. 1996). While we are permitted to look at the record as a whole, including the supplemental appendix submitted by BNSF, nothing requires us to look past the appendix submitted by Appellants. *See Milligan-Hitt v. Bd. of Trs. of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1231 (10th Cir. 2008) ("[W]e have no obligation to go further and examine documents that should have been included, and we regularly refuse to hear claims predicated on record evidence not in the appendix."); *see also* 10th Cir. R. 10.3(B) ("The court need not remedy any failure by counsel to designate an adequate record. *When the party asserting an issue fails to provide a record sufficient for considering that issue, the court may decline to consider it.*" (emphasis added)); 10th Cir. R. 30.1(B)(3) ("The court need not remedy any failure of counsel to provide an adequate appendix.").

That said, our cases addressing deficiencies in the appendix submitted by an appellant define a guiding principle regarding enforcement of our rules that we

choose to apply here. Where an appendix is generally deficient but the materials provided by the appellant permit us to reach a firm and definite conclusion regarding the merits of an individual argument or claim within the appeal, we often will, but need not, address the argument or claim. Where, however, we are forced to venture a guess as to the merits of an argument or claim, even "an informed guess," we will summarily affirm the district court's judgment. *See Travelers Indem. Co.*, 340 F.3d at 1120 (noting, in face of deficient record on appeal, an "unwilling[ness] to reverse the decision of the district court based on a guess—even what we may think to be an informed guess"); *Tilton*, 115 F.3d at 1474 ("Because the appellant's appendix is insufficient to permit assessment of this claim of error, we must affirm."); *see also Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1221–22 (10th Cir. 2000) (relying on 10th Cir. R. 30.1(A)(1) and Fed. R. App. P. 10(b)(2) to affirm grant of summary judgment where appellant failed to submit adequate appendix). In applying these principles here, we alternatively summarily affirm the district court's judgment on portions of claims where the evidence presented in the appendix submitted by Appellants is insufficient to reach a firm and definite conclusion on an issue.

Additionally, because we conclude that counsel's failings constitute a clear violation of both the language and spirit of the rules governing the appendix, we deem this to be a situation where additional repercussions are appropriate. First, we have long held that where a party submits an appendix that does not comply with our local rules, the court may disallow recovery of appellate costs, under Federal Rule of Appellate Procedure 39(a), relative to that appendix. *Saulsbury Oil Co. v. Phillips*

*Petroleum Co.*, 142 F.2d 27, 40 (10th Cir. 1944). Second, in situations, as here, where an appeal results in the partial affirmance and partial vacatur of a district court's decision, Federal Rule of Appellate Procedure 39 gives the appellate court discretion to tax costs against one party or the other party. *Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077, 1081 (9th Cir. 2009); *see also* Fed. R. App. P. 39(a)(4) ("[I]f a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed *only as the court orders*." (emphasis added)). Employing our discretion, we (1) preclude Appellants from recovering any appellate costs and (2) permit BNSF to recover all of its appellate costs, including costs related to the supplemental appendix. *See Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 50 & n.4 (3d Cir. 1991) (shifting appellate costs to prevailing appellant because appellant failed to comply with rules governing appendix), *abrogated on other grounds by Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014); *Blue Pearl Music Corp. v. Bradford*, 728 F.2d 603, 607 n.7 (3d Cir. 1984) (shifting costs for supplemental appendix to prevailing appellant because appellant submitted appendix that did not comply with rules). In accordance with Federal Rule of Appellate Procedure 39(d)(1), BNSF shall have fourteen days from the entry of judgment to seek its appellate costs.[15]

---

[15] Although, pursuant to Federal Rule of Appellate Procedure 46(c), we could commence disciplinary proceedings against Appellants' counsel for failing to comply with this court's rules governing the appendix, *see Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 226–27 (7th Cir. 1996) (collecting cases involving submission of deficient appendix and relying on Rule 46(c) to impose $1000 fine), we exercise our discretion and opt not to invoke Rule 46(c).

Having addressed the issues raised by Appellants' deficient appendix, we now turn to the merits of the claims properly before us on appeal. We begin with Appellants' ADA discrimination claim. We then consider the Appellants' ADA failure to accommodate claim. Next, we address Appellants' retaliation claims under the ADA and the FRSA. With respect to each claim, we analyze each unsuccessful job application with respect to each Appellant separately.

## 3. ADA Discrimination Claim

### a. *Standard governing claim & burden of proof framework*

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, a court uses the *McDonnell Douglas*[16] burden-shifting framework to evaluate an ADA discrimination claim premised on disparate treatment. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015). The first step of the *McDonnell Douglas* burden-shifting framework requires the plaintiff to establish a prima facie case of discrimination by showing (1) "that he is disabled within the meaning of the ADA"; (2) that he is qualified for the job held or desired; and (3) "that he was discriminated against because of his disability." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2016).

---

[16] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Below, BNSF conceded that, for purposes of summary judgment, Appellants satisfied the first element of a prima facie case. But BNSF challenged whether Appellants submitted sufficient evidence to satisfy the second and third elements of a prima facie case. Relative to the second element, the ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To demonstrate that he was a qualified individual, a plaintiff must first establish that he had "the requisite skill, experience, education and other job-related requirements of the employment position." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (quoting 29 C.F.R. § 1630.2(m)). Second, he must establish that he can perform the "essential functions" of the position. *See id.*

When determining what functions are essential to a position, "consideration shall be given to the employer's judgment . . . and if an employer has prepared a written description before . . . interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Based on this statutory instruction, courts "evaluating whether a job requirement is essential . . . place considerable weight on an employer's judgment concerning a particular job's essential functions." *Kilcrease*, 828 F.3d at 1221–22 (internal quotation marks omitted); *see* 29 C.F.R. § 1630.2(c)(3) (identifying "[t]he employer's judgment as to which functions are essential" as evidence of "whether a particular function is essential"). Likewise, "[b]ecause it is the employer's role to

34

describe the job and functions required to perform that job, we will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity." *Id.* at 1222 (internal quotation marks omitted). The deference provided to employers regarding what functions are essential, however, is not limitless, as "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function." *Hawkins*, 778 F.3d at 889 (quotation marks omitted); *see* 29 C.F.R. § 1630.2(n)(1) ("The term 'essential functions' does not include the marginal functions of the position."). Finally, if the employer presents "evidence that a job function or requirement is essential, the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential." *Kilcrease*, 828 F.3d at 1222.

Turning to the third element of a prima facie case, our inquiry focuses on whether the circumstances surrounding the adverse employment action "give rise to an inference that the [action] was based on [the plaintiff's] disability." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014). A plaintiff may establish an inference of discrimination through (1) "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," (2) "preferential treatment given to employees outside the protected class," (3) "a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified]," and (4) a "failure to surface plaintiff's name for positions for which she is well-qualified." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting

*Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996)). The mere fact that the plaintiff was qualified for a position but the employer selected another qualified individual who was not a member of plaintiff's protected class is insufficient to establish an inference of discrimination. *See Olson v. Philco-Ford*, 531 F.2d 474, 478 (10th Cir. 1976) (concluding that evidence of employer selecting qualified man over qualified woman did not establish inference of discrimination for prima facie case). Instead, the inference of discrimination element of the prima facie case "requires the plaintiff to present some affirmative evidence that disability *was a determining factor* in the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis added). The burden of production placed on the plaintiff relative to the inference of discrimination element, however, "is not onerous." *Id.* (internal quotation marks omitted).

If the plaintiff advances a prima facie case of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for not hiring the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer articulates a satisfactory reason, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason is a pretext for discrimination. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Id.* (internal quotation marks omitted). "This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's

36

proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (internal quotation marks omitted).

b. *Application of standard & framework*

i. Mr. Lincoln

1. Clerk position[17]

On August 1, 2012, Mr. Lincoln applied for the position of General Clerk-Administrative. BNSF did not select him for the position on the ground that other candidates were more qualified. At summary judgment, BNSF argued that Mr. Lincoln was not qualified for the position and that not being the most qualified candidate, rather than his disability, motivated the decision to not select him as a clerk. The district court concluded that while a genuine issue of material fact existed as to whether Mr. Lincoln was qualified for the position, Mr. Lincoln failed to advance sufficient evidence permitting an inference of discrimination or

---

[17] The district court considered two clerk positions—General Clerk-Administrative and Clerk-Revenue Management. In considering the Clerk-Revenue Management position, the district court found that Mr. Lincoln applied for this position on August 29, 2012. Our review of the record, however, shows that Mr. Lincoln applied for the Clerk-Revenue Management position on August 29, 2011. BNSF App'x at 1222. If Mr. Lincoln applied for the position in 2011, then he applied for the position more than 300 days before filing his EEOC charge and we affirm the district court's grant of summary judgment on this position on the alternative ground that the claim was not properly exhausted and the stipulation of the parties cannot be read as waiving an exhaustion defense relative to positions to which Appellants applied before April 16, 2012. In the alternative, if the record evidence we have located is incorrect and Mr. Lincoln in fact applied for the position on August 29, 2012, we summarily affirm the district court's dismissal of Mr. Lincoln's discrimination claim as to the Clerk-Revenue Management position because deficiencies in the Appellants' appendix prevent us from accurately determining the application date relative to the exhaustion date.

demonstrating BNSF's reason for not selecting him was a pretext for discrimination. On appeal, Mr. Lincoln challenges both of the district court's adverse conclusions.

Because Mr. Lincoln failed to advance sufficient evidence demonstrating BNSF's reason for not selecting him—that other applicants were more qualified— was a pretext for discrimination, we affirm the district court's judgment on this ground without considering whether Mr. Lincoln advanced sufficient evidence to establish an inference of discrimination. The "basic qualifications" listed in the posting for the General Clerk-Administrative position included (1) typing twenty-five words per minute with thirty-five words per minute preferred; (2) "[m]inimum of 1 year of verifiable training and/or work experience in an administrative function within an office environment"; and (3) "[m]inimum of 1 year of verifiable training and/or work experience resolving internal and/or external customer issues via telephone and/or email correspondence." BNSF App'x at 775–76. At the time of his application, Mr. Lincoln typed at twenty-six words per minute. It is not apparent from the appendix submitted by Appellants that Mr. Lincoln had any work experience in an office environment or that he had a year of training or work experience resolving customer issues. Furthermore, many of the resumes for the applicants for clerk positions reflected a Masters of Business Administration or status as a Certified Public Accountant; meanwhile, Mr. Lincoln had not obtained a four-year college degree. Therefore, even if Mr. Lincoln could convince a jury he was qualified for the position, Mr. Lincoln, at most, barely met the minimum criteria for the position and was not as qualified as other applicants. Thus, Mr. Lincoln fails to

38

establish there was anything false, weak, implausible, inconsistent, or incoherent about BNSF's proffered reason for not selecting him for the General Clerk-Administrative position.[18] *Cf. DePaula*, 859 F.3d at 970 (stating bases for establishing pretext).

2. Shop positions

a. Exhausted positions

The district court considered the merits of Mr. Lincoln's ADA discrimination claim as to six shop positions: (1) Mechanical Shop Laborer—applied for July 19, 2012; (2) Pipefitter—applied for August 1, 2012; (3) Carman-Railcar Repair—applied for September 26, 2012; (4) Mechanical Shop Laborer—applied for November 1, 2012; (5) Pipefitter—applied for November 1, 2012; and (6) Carman-

---

[18] To the extent Mr. Lincoln attempts to establish pretext by relying on the evidence he advanced relative to the inference of discrimination element of his prima facie case, the evidence does not establish a genuine issue of material fact on the issue of pretext. First, Mr. Lincoln contends that Ms. Artzer was biased against him based on his disability. He supports this contention by pointing to a line of questions she asked him during a 2013 interview for a Boilermaker position. But the Boilermaker interview occurred seven months *after* BNSF filled the General Clerk-Administrative position. Further, the record evidence shows that Ms. Artzer did not learn of Mr. Lincoln's disability until his request for accommodation letter in October 2012, months after BNSF filled the General Clerk-Administrative position. Second, Mr. Lincoln contends two MEH employees encouraged him to apply for the General Clerk-Administrative position and suggested he had a good chance of being selected for the position. The deposition testimony of the MEH employees to which Mr. Lincoln directs the court, however, substantiates only the former of Mr. Lincoln's two contentions. *See* BNSF App'x at 1187, 1204-05 (cited to by Appellants as Doc. 73-6 at 83:21-85:9). Nothing about the MEH employees encouraging Mr. Lincoln to apply for open positions at BNSF, however, suggests that BNSF selected a different candidate for reasons other than the candidate was more qualified than Mr. Lincoln.

Railcar Repair—applied for November 1, 2012. Each of these shop positions was partially or primarily performed in Building 12 of BNSF's Topeka, Kansas, railyard.

The district court concluded that working outside was an essential job function for each shop position such that Mr. Lincoln was not qualified for any of the positions. The district court supported this conclusion with three premises. First, while Building 12 was a partially climate controlled structure, it had doors the size of a locomotive that were always open, potentially creating outdoor-like conditions in Building 12. Second, even if Building 12 qualified as indoors, up to 10% of the work for each position was performed outside of Building 12, and the statements from Mr. Lincoln's medical professional restricted him from working outdoors.[19] Third, no reasonable accommodation existed to permit Mr. Lincoln to perform the shop positions because the shop positions entailed outdoor work. Thus, the district court determined that Mr. Lincoln failed to satisfy the second element of a prima facie case of discrimination relative to the shop positions—that he was qualified for any of the positions. Alternatively, the district court concluded that even if Mr. Lincoln established a prima facie case of discrimination, he failed to sustain his burden at the

---

[19] Appellants argue that they told BNSF that they could work one to one-and-a-half hours outdoors a day. BNSF, however, was not in a position to rely on Appellants' personal, untrained statements about their capabilities to work outdoors when the only statements on file from Appellants' medical professionals stated Appellants could not work outdoors. *See Otto v. City of Victoria*, 685 F.3d 755, 758–59 (8th Cir. 2012) (rejecting employee's contention about what functions he told his employer he could physically perform where employee's statements were "undermined" by physician's evaluation and noting that "ADA 'does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.'" (quoting *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003))).

third step of the *McDonnell Douglas* burden-shifting framework because he did not demonstrate that BNSF's reasons for not selecting him, primarily that he was not the best qualified candidate, were a pretext for discrimination.

On appeal, Mr. Lincoln challenges both of the district court's bases supporting summary judgment. To resolve this issue, we analyze each of the shop positions to which Mr. Lincoln applied.

    i. Carman-Railcar Repair positions

    [1] Qualified

We conclude that Mr. Lincoln advanced sufficient evidence to place into dispute whether performing outdoor work was an essential job function for some of the positions primarily performed in Building 12. *Cf. Kilcrease*, 828 F.3d at 1222 ("Once the employer has come forward with evidence that a job function or requirement is essential, the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential."). Relative to the performance of work in Building 12, BNSF adduced testimony from Ms. Artzer that doors the size of a locomotive were always open such that the structure did not protect against elements from the outdoors. But there is no dispute that Building 12 was a very large structure with a roof and at least two walls that did not have any doors. Further, Mr. Lincoln advanced evidence suggesting that Building 12 was at least partially climate controlled. Specifically, Steve Hopkins, a BNSF employee of over forty years who was familiar with Building 12, provided a declaration stating that "Building 12 is kept relatively warm in the winter, such that workers there will

41

need no more than light jackets. And in the summer, Building 12 is kept relatively comfortable by the many fans operating, and by the open doors." App. App'x at 46. Thus, a genuine issue of material fact exists with respect to the temperature and atmospheric conditions in Building 12 and whether work in Building 12 could properly be viewed as outdoor work.[20]

Although Mr. Lincoln may be able to convince a jury that work in Building 12 is not outdoor work, Mr. Lincoln must also demonstrate that the jobs partially or primarily performed in Building 12 did not entail a sufficient amount of work outside of Building 12; otherwise his restriction for no outdoor work would disqualify him from performing the positions. Viewing the evidence in the light most favorable to Mr. Lincoln, we return to Mr. Hopkins's declaration, which states that "[a]t least 90 percent of the time that Carmen, Pipefitters, and Boilermakers are working, they're working indoors." App App'x at 46. From this, we infer that Carmen spend up to 10% of the time, or up to roughly forty-eight minutes per eight-hour shift, working outside of Building 12. While the only medical evidence shows that Mr. Lincoln could not work outdoors at all, an individual can still be qualified for a position if,

_____

[20] In the district court, BNSF also argued that Mr. Lincoln was not qualified for jobs in Building 12 because he could not perform a job that exposed him to chemicals, fumes, and toxins. The arguments and evidence advanced on appeal by both parties relative to the presence of chemicals, fumes, and toxins in Building 12 are not sufficiently developed for us to draw any conclusion regarding whether this consideration disqualified Mr. Lincoln from performing positions partially or primarily performed in Building 12. To the extent we conclude Mr. Lincoln may have been qualified for a position, we leave open the issue regarding the presence of chemicals, fumes, and toxins for further development during additional summary judgment proceedings on remand.

42

with a reasonable accommodation, the individual can perform the essential job functions of the position. 42 U.S.C. § 12111(8). An accommodation entailing reassignment of up to 10% of an employee's tasks may be reasonable absent some showing by BNSF that it could not accommodate Mr. Lincoln.

On appeal, BNSF suggests the reassignment of work duties would violate the collective bargaining agreement between BNSF and the union. But BNSF neither quotes any specific language of the collective bargaining agreement nor cites any entry in their supplemental appendix or the record below that contains the collective bargaining agreement. *See* Fed. R. App. P. 28(a)(8)(A), (b) (requiring appellee to cite to record in support of arguments). Accordingly, we are unable to evaluate BNSF's argument based on the language of the collective bargaining agreement and are left to conclude that if Mr. Lincoln could work in Building 12 without an accommodation, a reasonable accommodation *may* exist relative to the remaining work outside of Building 12. From this, we conclude that, based on the record before us, a genuine issue of material fact exists with respect to whether Mr. Lincoln was qualified for the Carman-Railcar Repair positions. Thus, we next consider whether Mr. Lincoln satisfied the third element of his prima facie case.

[2]  Inference of discrimination

On appeal, Mr. Lincoln identifies three pieces of evidence in support of the third element of his prima facie case. First, Mr. Lincoln points to Ms. Artzer's role as the hiring manager for all the shop positions. And, Mr. Lincoln cites *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1144 (10th Cir. 2009), for the proposition

that numerous adverse employment actions by the same decisionmaker permits an inference that the decisionmaker was biased. But the facts of *Turner* involved more than a decisionmaker taking multiple adverse employment actions against the plaintiff. Instead, the defendant in *Turner*, in addition to allegedly taking an adverse action against the plaintiff, had previously been proven to have discriminated against another individual who belonged to the same protected class as the plaintiff. *See id.* ("In some instances, numerous adverse employment actions involving *other protected employees* . . . may suggest the decision maker was motivated by the same general discriminatory bias." (emphasis added)). Here, there is no past evidence of general discriminatory bias by Ms. Artzer against disabled individuals and Appellants do not identify any other disabled candidate whom Ms. Artzer rejected.

Alternatively, Mr. Lincoln contends that Ms. Artzer's deposition testimony establishes that she harbored bias against him because she believed he had a "negative attitude" and seemed "entitled" to a job. Opening Br. at 49. But, this argument conflates Ms. Artzer's possible bias against Mr. Lincoln as an individual with a bias against individuals who are disabled. Only the latter would permit an inference of discrimination. Furthermore, where Mr. Lincoln applied for the first Carman-Railcar Repair position in September 2012 and Ms. Artzer did not learn of Mr. Lincoln's disability until October 2012, it is not apparent how Ms. Artzer's decision not to hire Mr. Lincoln for the first Carman-Railcar Repair position can be attributed to discrimination. In sum, Ms. Artzer's role as the hiring manager for all the shop positions and her negative comments about Mr. Lincoln's attitude do not

44

permit the conclusion that discriminatory animus against the disabled was a determining factor in BNSF's hiring decision.

Second, Mr. Lincoln argues "BNSF's baseless assertion that Building 12 . . . is outdoors" permits an inference of discrimination. *Id.* at 48–49. But evidence "tending to cast doubt on an employer's stated reasons for an employment decision" does not always satisfy the "burden of establishing an inference of actionable discriminatory animus [at the prima facie stage]." *Adamson v Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008). "Without a demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent," the potential falsity of an employer's proffered reason for taking an adverse employment action "merely establishes that an employer's stated reason for its actions may not be its real or only reason. It does not establish that the real or 'but-for' reason was unlawful discrimination." *Id.* Here, no such nexus exists and it cannot be said that BNSF's reliance on Building 12 being outdoors and Mr. Lincoln not being qualified to work outdoors permits the inference that discriminatory animus against the disabled was a determining factor in BNSF's decision not to hire him for either of the Carman-Railcar Repair positions.[21]

Third, Mr. Lincoln argues that BNSF's refusal to engage in the interactive process after he submitted his accommodation request letters permits an inference of

---

[21] Our forthcoming conclusions with regard to Mr. Lincoln not establishing that he was qualified for the majority of the shop positions to which he applied factor into our conclusion that BNSF's potentially false reliance on Building 12 being outdoors is insufficient to establish an inference of discrimination.

discrimination. Mr. Lincoln's argument, however, ignores MEH's efforts over two-plus years to work with Mr. Lincoln and place him in a job prior to his submission of the accommodation request letters. And those efforts by MEH, including offering to pay for Mr. Lincoln to complete both vocational training and his college degree, strongly contradict any inference that BNSF acted with discriminatory animus toward Mr. Lincoln on the basis of his disability.

In sum, none of Mr. Lincoln's evidence, individually or cumulatively, establishes that discriminatory animus was a determining factor in BNSF's decision not to select Mr. Lincoln for the Carman-Railcar Repair positions.

[3] Pretext

Even had Mr. Lincoln satisfied his burden at the prima facie step, summary affirmance at the pretext step is appropriate. In addition to concluding that Mr. Lincoln failed to establish a prima facie case, the district court alternatively granted summary judgment on the ground that Mr. Lincoln failed to demonstrate that BNSF's reason for not selecting him was a pretext for discrimination. The materials provided in the appendix submitted by Appellants do not permit for adequate review of this determination.

With respect to his September 26, 2012, application, the record indicates that BNSF did not select Mr. Lincoln because of an "[u]nacceptable [i]nterview." BNSF App'x at 1222. The district court noted that BNSF did not hire Mr. Lincoln for any of the shop positions "because he was not the best qualified for the positions." App. App'x at 98. The appendix submitted by Appellants contains *zero* evidence or

46

information about Mr. Lincoln's interview for the September 26, 2012, Carman-Railcar Repair position. Likewise, the appendix submitted by Appellants contains *zero* evidence about who BNSF selected for the two Carman-Railcar Repair positions and how the selected candidates' experience and qualifications compared to Mr. Lincoln's experience and qualifications. Thus, Mr. Lincoln failed to provide us the basic information necessary to evaluate the legitimacy of BNSF's reasons for not selecting him for either of the Carman-Railcar Repair positions.

ii.     Pipefitter positions

Although we have concluded that a genuine issue of material fact may exist with respect to whether Mr. Lincoln was qualified to perform some jobs primarily based in Building 12, this conclusion does not dictate that Mr. Lincoln was qualified for every position primarily performed in Building 12. As discussed earlier, once the employer presents evidence regarding the qualifications, prerequisites, and essential functions of a position, the burden is on the plaintiff to demonstrate that he was qualified or to rebut the employer's evidence that a qualification, prerequisite, or function was actually essential for selection to the position. *See Kilcrease*, 828 F.3d at 1222; *Tate*, 268 F.3d at 993. Thus, although "both parties face a burden of production, the plaintiff always bears the ultimate burden of persuasion." *Hawkins*, 778 F.3d at 895.

Relative to the Pipefitter position, BNSF, through Ms. Artzer's deposition testimony, advanced evidence demonstrating that prior pipefitting or plumbing experience was a prerequisite for selection as a Pipefitter. And, Ms. Artzer further

47

testified that she deemed Mr. Lincoln unqualified for the Pipefitter positions because he "did not have plumbing and pipe fitting experience." BNSF App'x at 145. Mr. Lincoln does not advance any evidence demonstrating that either (1) he had plumbing or pipefitting experience or (2) plumbing or pipefitting experience was not actually a prerequisite for selection as a Pipefitter. Accordingly, Mr. Lincoln fails to carry his burden with respect to establishing that he was qualified for the Pipefitter positions. Therefore, we affirm the district court's dismissal of Mr. Lincoln's ADA discrimination claim relative to the two Pipefitter positions.[22]

### iii.     Mechanical Shop Laborer positions

While Mr. Hopkins's declaration indicates that individuals holding the positions of Carman-Railcar Repair, Pipefitter, and Boilermaker perform at least 90% of their duties within Building 12, his declaration does not speak to what percent of the time Mechanical Shop Laborers spend inside Building 12. Nor does any other evidence in the appendix submitted by Appellants speak to the issue. For its part, BNSF directs us to testimony suggesting that Mechanical Shop Laborers spend far more than 10% of their time outside of Building 12. In her deposition, Ms. Artzer stated that Mechanical Shop Laborers "are almost always outside" performing such

---

[22] In the alternative, the appendix submitted by Appellants does not contain any information regarding the requirements for the Pipefitter position or whether Mr. Lincoln possessed plumbing or pipefitting experience. As stated above, where deficiencies in the appendix prevent us from reaching a firm and definite conclusion on a matter essential to the resolution of an argument or claim, we will summarily affirm the district court's decision. Therefore, we alternatively summarily affirm the district court's grant of summary judgment as to Mr. Lincoln's ADA discrimination claim relative to his applications for the two Pipefitter positions.

tasks as "moving locomotives, washing locomotives, [and] driving a fork lift all over the 132 acres to gather parts." BNSF App'x at 144. From this, we conclude that Mr. Lincoln failed to sustain his burden of refuting BNSF's evidence that outdoor work was an essential job function of the Mechanical Shop Laborer position, in that a Mechanical Shop Laborer was outside for a sufficiently substantial period of time that a reasonable accommodation was not available. And even if we were not to reach this conclusion, the materials in the appendix submitted by Appellants would leave us guessing at what percent of the time a Mechanical Shop Laborer spends outside of Building 12, compelling us to summarily affirm the district court's dismissal of Mr. Lincoln's ADA discrimination claim relative to not being selected for the Mechanical Shop Laborer positions.

### b. Unexhausted positions

Based on Mr. Lincoln's failure to exhaust administrative remedies, the district court concluded it lacked jurisdiction over Mr. Lincoln's ADA discrimination claim with respect to two positions: (1) Mechanical Shop Laborer—applied for March 28, 2013; and (2) Boilermaker—applied for March 28, 2013. As discussed earlier, we reverse the district court's jurisdictional rulings and leave open the question of whether the district court should enforce the stipulation that expressly waived an exhaustion defense. Apart from an exhaustion defense, BNSF, both in the district court and on appeal, raises merit-based arguments in favor of summary judgment on the positions the district court did not consider based on a lack of jurisdiction. Because these arguments are properly preserved and Appellants address the

49

arguments in their appellate briefs, we consider whether an alternative ground supports granting summary judgment.

### 1. Mechanical Shop Laborer position

Above, we concluded that Mr. Lincoln failed to advance any evidence with respect to what percent of the time Mechanical Shop Laborers perform duties outside of Building 12 and that BNSF's evidence suggested Mechanical Shop Laborers performed a substantial amount of work outside of Building 12. Accordingly, the reasons we affirmed the district court's grant of summary judgment as to Mr. Lincoln's ADA discrimination claim relative to his July 2012 and November 2012 applications for the Mechanical Shop Laborer position compel us to conclude that summary judgment was appropriate as to Mr. Lincoln's March 28, 2013, Mechanical Shop Laborer application.

### 2. Boilermaker position

Mr. Lincoln applied for a Boilermaker position on March 28, 2013. Based on Mr. Hopkins's declaration, we must assume that Boilermakers worked outside only 10% of the time, at most, and that Mr. Lincoln may have been qualified for the position. The best evidence we can locate for why BNSF did not select Mr. Lincoln for the Boilermaker position states merely that Mr. Lincoln was "[n]ot [s]elected— [i]nterviewed." BNSF App'x at 1223. From this, we are unable to determine, in the first instance, whether Mr. Lincoln established an inference of discrimination relative to the Boilermaker position or whether BNSF's reason for not selecting Mr. Lincoln was a pretext for discrimination. Therefore, BNSF has not established an alternative

50

ground supporting the district court's dismissal of Mr. Lincoln's ADA discrimination claim relative to the Boilermaker position.. On remand, the district court should determine whether to enforce the stipulation on the exhaustion issue and, if it decides to do so, permit BNSF to reassert its arguments raised during the initial summary judgment proceedings.

### c. Safety Assistant position

Finally, on appeal, Mr. Lincoln suggests that BNSF's decision to reject the union's appointment of him to the Safety Assistant position is part of his ADA claims. But this suggestion differs from Mr. Lincoln's position in the district court. In responding to BNSF's motion for summary judgment, Mr. Lincoln described the scope of his claims as follows:

The nine job applications at issue with respect to Lincoln's ADA claims are as follows:

1. Mechanical Shop Laborer, July 19, 2012
2. General Clerk-Administrative, Aug. 1, 2012
3. Pipefitter, Aug. 1, 2012
4. Carman-Railcar Repair, Sept. 26, 2012
5. Carman-Railcar Repair, Nov. 1, 2012
6. Mechanical Shop Laborer, Nov. 1, 2012
7. Pipefitter, Nov. 1, 2012
8. Boilermaker, March 28, 2013
9. Mechanical Shop Laborer, March 28, 2013

The adverse actions at issue in Lincoln's claims are as follows: Lincoln's ADA discrimination claims attack Defendant's failures to hire him into each of these seven [sic] jobs, while his ADA failure to accommodate and retaliation claims apply to jobs five through nine. Lincoln's FRSA claim applies only to Defendant's blocking him from accepting an appointment to the Safety Assistant position.

51

BNSF App'x at 931–32 (footnote omitted); *see also id.* at 973. And when discussing the merits of each ADA claim, Mr. Lincoln's response to summary judgment discusses each specific position to which he applied but makes no mention of the Safety Assistant position to which he was appointed. Apparently recognizing Mr. Lincoln's characterization of his own claims, the district court did not mention the Safety Assistant position when it identified which of the positions were exhausted and which were unexhausted. *See* App. App'x at 75–76 (identifying March 28, 2013, Boilermaker and Mechanical Shop Laborer applications as unexhausted and identifying remaining seven applications listed in Mr. Lincoln's response to summary judgment as exhausted). We decline to consider Mr. Lincoln's arguments on appeal relative to the Safety Assistant position because, in characterizing the scope of his claims to the district court, Mr. Lincoln waived any argument that the Safety Assistant position was part of his ADA claims. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011) ("If the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it.").

    ii. <u>Mr. Mosbrucker</u>

        1. Clerk positions

            a. Exhausted positions

Within the period of time that the district court determined Mr. Mosbrucker had exhausted his administrative remedies, Mr. Mosbrucker applied for three clerk

positions: (1) Analyst/Senior Analyst Payroll Production—applied for July 31, 2012; (2) General Clerk-Administrative—applied for July 31, 2012; and (3) Technology Services Management Trainee—applied for October 10, 2014. BNSF moved for summary judgment on each position, and Mr. Mosbrucker failed to advance any arguments against summary judgment. Thus, the district court concluded that Mr. Mosbrucker abandoned his claims as to these three positions. As was the case below, Mr. Mosbrucker, on appeal, does not raise any arguments regarding the merits of his claims relative to these three positions. Accordingly, Mr. Mosbrucker waived and forfeited review of the district court's grant of summary judgment on his ADA discrimination claim as to these three clerk positions. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007); *Wilburn v. Mid-South Health Dev., Inc.*, 343 F.3d 1274, 1280–81 (10th Cir. 2003).

   b.  Unexhausted position

Mr. Mosbrucker applied to a fourth clerk position: Part Time Analyst/Senior Analyst—applied for August 31, 2013. Because Mr. Mosbrucker applied to this position after his first EEOC charge but more than 300 days before his second EEOC charge, the district court concluded he did not exhaust his administrative remedies as to the position, thereby depriving the court of jurisdiction to entertain claims based on the position. In light of our earlier analysis on the jurisdictional issue, we might be inclined to remand for further summary judgment proceedings. As with the three exhausted clerk positions, however, Mr. Mosbrucker has never advanced any arguments as to the merits of his ADA discrimination claim based on not being

53

selected for the Part Time Analyst/Senior Analyst position. Accordingly, we conclude Mr. Mosbrucker waived and forfeited appellate review of the merits of this claim.

2. Shop positions

The district court considered seven shop positions when evaluating Mr. Mosbrucker's ADA discrimination claim and excluded three additional positions based on lack of jurisdiction due to failure to exhaust. On the exhausted shop positions, the district court concluded that Mr. Mosbrucker was not qualified and that, even if he could make out a prima facie case of discrimination, he did not demonstrate that BNSF's reasons for not selecting him were a pretext for discrimination. We consider each position in turn, noting at the outset that our conclusions regarding whether a given position necessarily entailed a sufficient amount of outdoor work to disqualify Mr. Lincoln from the position apply to our analysis of Mr. Mosbrucker's claim.[23]

a. Exhausted positions

i. Mechanical Shop Laborer positions

Mr. Mosbrucker applied for the position of Mechanical Shop Laborer on July 17, 2012, and on November 24, 2014. As was the case with Mr. Lincoln, Mr.

---

[23] Unique to Mr. Mosbrucker is the fact that he is afraid of moving trains and his medical professional restricted him from working in proximity to moving trains. The record does not clearly reveal to what extent a given position exposed an employee to moving trains. Thus, we leave open the issue of whether Mr. Mosbrucker's fear of moving trains disqualified him from performing the essential job functions of a position.

Mosbrucker failed to advance sufficient evidence to overcome BNSF's evidence that outdoor work was an essential function of the Mechanical Shop Laborer position. Additionally, the record shows that Mr. Mosbrucker never passed the Mechanical Aptitude Test, first failing to show up for the test relative to his July 17, 2012, application and then failing the test relative to his November 24, 2014, application. Thus, apart from whether the Mechanical Shop Laborer position required outdoor work, Mr. Mosbrucker failed to meet a prerequisite for selection to the position and, under *Tate*, 268 F.3d at 993, cannot establish he was qualified for the position. Accordingly, we affirm the district court's grant of summary judgment relative to the exhausted Mechanical Shop Laborer positions.

ii. Electrician Diesel Engines & Mechanic Diesel Engines positions

Mr. Mosbrucker applied twice for the Electrician Diesel Engines position on October 10, 2014, and again on November 26, 2014. Further, Mr. Mosbrucker applied for a Mechanic Diesel Engines position on November 5, 2014. Similar to the Mechanical Shop Laborer positions, it appears that passage of the Mechanical Aptitude Test was a prerequisite for selection for the positions of Electrician Diesel Engines and Mechanic Diesel Engines. Yet the record provided by BNSF shows that Mr. Mosbrucker failed the Mechanical Aptitude Test relative to his two November 2014 applications. And there is no indication in the appendix submitted by Appellants that Mr. Mosbrucker ever passed the Mechanical Aptitude Test. Accordingly, Mr. Mosbrucker failed to advance evidence showing that he satisfied a prerequisite for selection to the positions of Electrician Diesel Engines and Mechanic

55

Diesel Engines. Therefore, we affirm the district court's grant of summary judgment on Mr. Mosbrucker's ADA discrimination claim relative to these three applications.[24]

### iii. Pipefitter position

Mr. Mosbrucker applied for a Pipefitter position on July 31, 2012. As noted when discussing Mr. Lincoln's claims, Mr. Mosbrucker fails to carry his burden with respect to demonstrating that he had plumbing or pipefitting experience or that such experience was not a prerequisite for selection to the position. Accordingly, we affirm the district court's grant of summary judgment on Mr. Mosbrucker's ADA discrimination claim relative to the Pipefitter position.[25]

### iv. Carman-Railcar Repair position

Mr. Mosbrucker applied for a Carman-Railcar Repair position on September 26, 2012. As with Mr. Lincoln, we conclude that Mr. Mosbrucker may have established a genuine issue of material fact regarding whether he was qualified, with an accommodation, to perform the duties of the Carman-Railcar Repair position. But also like with Mr. Lincoln, we conclude that Mr. Mosbrucker has not advanced sufficient evidence to carry his burden on the third element of his prima facie case.

---

[24] In the alternative, we summarily affirm the district court's grant of summary judgment on these positions because the appendix submitted by Appellants does not contain any information regarding the requirements for selection to these two positions or whether Mr. Mosbrucker ever passed the Mechanical Aptitude Test.

[25] As with Mr. Lincoln, we alternatively summarily affirm the grant of summary judgment based on the deficient appendix.

Thus, we affirm the district court's grant of summary judgment on Mr. Mosbrucker's ADA discrimination claim relative to the Carman-Railcar Repair position.[26]

       b. Unexhausted positions

Based on its jurisdictional ruling with respect to the exhaustion of administrative remedies, the district court did not consider Mr. Mosbrucker's ADA discrimination claim relative to three shop positions: (1) Mechanical Shop Laborer—applied for March 28, 2013; (2) Mechanical Shop Laborer—applied for August 21, 2013; and (3) Boilermaker—applied for March 28, 2013. Relative to the Mechanical Shop Laborer positions, in light of the evidence indicating that the position entailed substantial outdoor work and given that Mr. Mosbrucker did not pass the Mechanical Aptitude Test, we conclude Mr. Mosbrucker did not advance sufficient evidence to create a genuine issue of material fact with respect to whether he was qualified to serve as a Mechanical Shop Laborer. Thus, summary judgment as to Mr. Mosbrucker's ADA discrimination claim relative to his Mechanical Shop Laborer applications dated March 28, 2013, and August 21, 2013, was appropriate. However, the reasons causing us to remand Mr. Lincoln's ADA discrimination claim on the Boilermaker position also cause us to remand Mr. Mosbrucker's ADA discrimination claim on the Boilermaker position.

---

[26] In the alternative, we summarily affirm the grant of summary judgment as to this position because the appendix submitted by Appellants does not contain sufficient evidence for us to evaluate the district court's conclusion that Mr. Mosbrucker did not sustain his burden at the pretext stage.

c. *Summation*

We affirm the district court's grant of summary judgment as to the exhausted clerk positions to which Appellants applied and conclude that Mr. Mosbrucker has waived and forfeited appellate review of his claim as to the unexhausted clerk positions. As to the shop positions, we determine that Appellants may have raised a genuine issue of material fact as to whether they were qualified for the Carman-Railcar Repair positions. But they have not carried their burden on the third element of their prima facie case, so we affirm the grant of summary judgment. Alternatively, we summarily affirm their ADA discrimination claims on the Carman-Railcar Repair positions because the appendix Appellants submitted does not permit for adequate evaluation of the issue of pretext. Further, we conclude that Appellants did not advance sufficient evidence to demonstrate they were qualified for the Pipefitter, Mechanical Shop Laborer, Electrician Diesel Engines, or Mechanical Diesel Engines positions. Accordingly, summary judgment was appropriate on those positions.[27] We also hold that Mr. Lincoln waived appellate review of any ADA claims relative to the Safety Assistant position. Finally, we conclude that Appellants may have advanced sufficient evidence to create a genuine issue of material fact regarding whether they were qualified for the Boilermaker position to which they both applied on March 28, 2013. And because the district court did not reach the merits of Appellants' ADA

---

[27] Alternatively, we summarily affirm the grant of summary judgment on these four positions.

58

discrimination claims on the Boilermaker position, we remand for further proceedings consistent with this opinion.

## 4. ADA Failure to Accommodate Claim

### a. *Standard governing claim & burden of proof framework*

The ADA defines the phrase "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017) (alterations omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)). Because "any failure to provide reasonable accommodations for a disability is necessarily because of disability," it follows that a plaintiff need not prove the employer's motivation or intent to discriminate to prevail on a failure to accommodate claim. *Id.* As a result, a failure to accommodate claim is evaluated under a modified *McDonnell Douglas* burden-shifting framework. *Id.* at 1049–50. Under the first step of the modified framework, a plaintiff must demonstrate that "(1) [he] is disabled; (2) [he] is otherwise qualified; and (3) [he] requested a plausibly reasonable accommodation." *Id*. at 1050 (internal quotation marks omitted). If the plaintiff makes a showing on all three elements, the burden "shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or

one of the other affirmative defenses available to the employer." *Id.* (quotation marks omitted).

b.  *What is a "reasonable accommodation"?*

The parties dispute what constitutes a "reasonable accommodation"—specifically whether an employer with an internal policy in favor of hiring the most qualified individual for a position must reassign an employee who cannot return to his existing position because of a disability to a vacant position for which the employee is qualified, without making the employee compete against other applicants. Encompassed in this dispute is whether our decision in *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999) (en banc), remains good law after the Supreme Court's decision in *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). BNSF argues that, post-*Barnett*, an employer's policy in favor of hiring the most qualified applicant prevents a disabled employee from relying on reassignment to a vacant position to satisfy the reasonable accommodation element of the employee's prima facie case. Appellants, as well as the EEOC, argue that *Barnett* created a limited exception to an employee's ability to rely on reassignment to a vacant position where reassignment would conflict with an established seniority system but that *Barnett*'s general discussion of reassignment as a reasonable accommodation strengthens our decision in *Smith*. We agree with Appellants and the EEOC that *Smith* and *Barnett* are in harmony, and we apply them accordingly.

The ADA defines "reasonable accommodation" to "include . . . job restructuring, part-time or modified work schedules, *reassignment to a vacant*

60

*position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (emphasis added). "[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Punt*, 862 F.3d at 1051 (emphasis omitted).

The inclusion of "reassignment to a vacant position" in the statutory definition of "reasonable accommodation" places a duty on the employer to evaluate whether a disabled employee, who even with reasonable accommodation cannot return to his existing position, is qualified to perform a vacant position within the employer's company. *Smith*, 180 F.3d at 1161–62. Further, under *Smith*, if the disabled employee is qualified for a vacant position, the employer has a duty to do more than merely "consider without discrimination [the] employee's request for reassignment along with all other applications the employer may receive from other employees or job applicants for a vacant position." *Id.* at 1164. Instead, in most situations, an employer must award the position to the disabled, but qualified, employee. *See id.* at 1166–67 ("Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise reassignment would be of little value and would not be implemented as Congress intended." (quoting EEOC Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, at 44 (1999))). In this sense, the ADA's "basic equal opportunity goal" sometimes requires an employer to afford a disabled employee preference in the hiring process. *Barnett*, 535 U.S. at 397;

*see id* at 398 ("The simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, *in and of itself*, automatically show that the accommodation is not 'reasonable.'").

But the requirement to reassign a disabled employee to a vacant position for which he is qualified is not absolute. Reassignment may not be reasonable where it conflicts with an "important employment polic[y]" adopted by the employer. *Smith*, 180 F.3d at 1175–76. One such policy is a seniority system that is part of a collective bargaining agreement. *Barnett*, 535 U.S. at 403–05; *see Smith*, 180 F.3d at 1176 (identifying seniority system as a policy that might defeat reasonableness of reassignment but doing so in general discussion of reassignment duty). In the face of an important employment policy such as a seniority system, an employee cannot satisfy the third element of his prima facie case for failure to accommodate by identifying reassignment as a reasonable accommodation. *Barnett*, 535 U.S. at 403–05.

BNSF argues that its policy in favor of hiring the most qualified applicant for a position is an important employment policy comparable to a seniority system. We reject this argument. BNSF's argument runs contrary to both the EEOC guidance we quoted in *Smith* and the Supreme Court's statement in *Barnett* that the ADA sometimes requires an employer to give preference to a disabled employee. Under BNSF's logic, every employer could adopt a policy in favor of hiring the most qualified candidate such that a disabled employee could never rely on reassignment

to establish the existence of a reasonable accommodation for purposes of his prima facie case. Such a result would effectively and improperly read "reassignment to a vacant position" out of the ADA's definition of "reasonable accommodation."

How then does an employer's policy in favor of hiring the most qualified applicant for a position factor into the modified *McDonnell Douglas* burden-shifting framework for evaluating a failure to accommodate claim? Although the existence of such a policy does not defeat the disabled employee's ability to satisfy the third element of his prima facie case, the policy properly comes into play once the burden shifts to the employer. Specifically, the employer may rely on the policy *as part of* an effort to conclusively rebut the third element of the employee's prima facie case or to establish an affirmative defense. For instance, the employer could point to its policy and argue that while the employee was technically qualified for a given position, the employee's qualifications for the position fell significantly below the qualifications of other applicants such that reassignment is not reasonable or would place an undue hardship on the employer. *See Barnett*, 535 U.S. at 401–02 (if employee demonstrates reassignment is reasonable "in the run of cases," the burden shifts to the employer to show that reassignment is not reasonable based on "special (typically case-specific) circumstances"). With this in mind, we next identify which position applications fall within Appellants' failure to accommodate claims.

c. *Scope of failure to accommodate claims*

Under the third element of the prima facie case, a failure to accommodate claim does not arise until after the employee "request[s] a plausible reasonable

63

accommodation." *See Punt*, 862 F.3d at 1050. Thus, where Appellants submitted their first accommodation request letters on October 1, 2012, they can raise failure to accommodate claims only based on positions to which BNSF did not select them after October 1, 2012. Mr. Lincoln applied to five positions after October 1, 2012: (1) Carman-Railcar Repair—applied for November 1, 2012; (2) Mechanical Shop Laborer—applied for November 1, 2012; (3) Pipefitter—applied for November 1, 2012; (4) Boilermaker—applied for March 28, 2013; and (5) Mechanical Shop Laborer—applied for March 28, 2013. After October 1, 2012, Mr. Mosbrucker applied to nine positions: (1) Boilermaker—applied for March 28, 2013; (2) Mechanical Shop Laborer—applied for March 28, 2013; (3) Mechanical Shop Laborer—applied for August 21, 2013; (4) Analyst/Senior Analyst—applied for August 31, 2013; (5) Technology Services Management Trainee—applied for October 10, 2014; (6) Electrician Diesel Engines—applied for October 10, 2014; (7) Mechanic Diesel Engines—applied for November 5, 2014; (8) Electrician Diesel Engines—applied for November 26, 2014; and (9) Mechanical Shop Laborer— applied for November 24, 2014.[28]

---

[28] Mr. Lincoln and Mr. Mosbrucker both applied for a Carman-Railcar Repair position on September 26, 2012, just five days before they submitted their accommodation request letters. It is entirely possible that BNSF did not reject their applications for this position until after receipt of their accommodation request letters. As discussed *supra* at n.5, however, Mr. Lincoln and Mr. Mosbrucker, both below and on appeal, focus on the dates of their applications rather than the dates BNSF rejected their applications. Thus, Mr. Lincoln and Mr. Mosbrucker waived and forfeited any ability to pursue an ADA failure to accommodate claim relative to the Carman-Railcar Repair position to which they both applied prior to submitting their

Having identified which position applications fall within Appellants' ADA

failure to accommodate claims, we turn to whether, applying our earlier reasoning

relative to the qualification issue on the ADA discrimination claims, Appellants

advanced sufficient evidence to sustain a claim based on a given position.

d. *Was summary judgment proper?*[29]

    i. <u>Mr. Lincoln</u>

       1. Carman-Railcar Repair position—applied for 11/1/12

Earlier in our opinion, we concluded Mr. Lincoln may have advanced evidence

establishing a genuine issue of material fact that, with an accommodation, he was

qualified to perform the duties of the Carman-Railcar Repair position.[30] Accordingly,

---

accommodation request letters. *See Bowers*, 643 F.3d at 771; *Bronson*, 500 F.3d at 1104.

[29] In their opening brief, Appellants argue the district court erred in concluding that BNSF engaged in the interactive process and suggest they can advance their failure to accommodate claims past the summary judgment stage based on BNSF's failure to engage in the interactive process. But our case law is clear that an employee cannot maintain a failure to accommodate claim based solely on an employer's failure to engage in the interactive process. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc) ("Even if Midland Brake failed to fulfill its interactive obligations to help secure a reassignment position, Smith *will not be entitled to recovery unless he can also show* that a reasonable accommodation was possible and would have led to a reassignment position." (emphasis added)); *see also McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100–01 (2d Cir. 2009) (collecting cases from five other circuits holding failure to engage in interactive process is not sufficient to sustain failure to accommodate claim). In any event, based on MEH's over two years of efforts to provide Appellants training and job opportunities, we agree with the district court that the evidence conclusively shows that BNSF engaged in the interactive process.

[30] We leave open, for further development on remand, the issue of whether a reasonable accommodation existed.

in light of our conclusion that reassignment is a reasonable accommodation for purposes of Mr. Lincoln's prima facie case, we vacate the district court's grant of summary judgment on Mr. Lincoln's failure to accommodate claim relative to the Carman-Railcar Repair position to which he applied on November 1, 2012. On remand, BNSF shall be permitted an opportunity to reassert arguments for summary judgment it raised in the initial summary judgment proceedings but that the district court did not reach.

2. Mechanical Shop Laborer positions—applied for 11/1/12 & 3/28/13

Earlier in our opinion, we concluded Mr. Lincoln failed to advance any evidence demonstrating that the Mechanical Shop Laborer position did not entail substantial outdoor work. Thus, Mr. Lincoln did not demonstrate that he was qualified for the Mechanical Shop Laborer positions. Accordingly, we affirm the district court's grant of summary judgment on his failure to accommodate claim relative to his two applications for the Mechanical Shop Laborer positions. In the alternative, deficiencies in the appendix submitted by Appellants would cause us to summarily affirm the district court's grant of summary judgment as to these positions.

3. Pipefitter position—applied for 11/1/12

As discussed above, Mr. Lincoln fails to demonstrate that he was qualified for the Pipefitter position. Thus we affirm the district court's grant of summary judgment on this position.[31]

4. Boilermaker position—applied for 3/28/13

The district court did not consider the merits of Mr. Lincoln's failure to accommodate claim relative to the Boilermaker position based on the conclusion that it lacked jurisdiction as to this position. Our earlier analysis suggests that Mr. Lincoln may have advanced sufficient evidence to create a genuine issue of material fact regarding whether he was qualified to perform the duties of the Boilermaker position. In light of our earlier jurisdictional analysis, we remand Mr. Lincoln's claim on this position. On remand, the district court should determine whether to enforce the stipulation on the exhaustion issue and, if it decides to enforce the stipulation, permit BNSF an opportunity to reassert arguments for summary judgment it raised in the initial summary judgment proceedings but that the district court did not reach.

ii. <u>Mr. Mosbrucker</u>

1. Boilermaker position—applied for 3/28/13

For the same reasons we vacate the district court's grant of summary judgment and remand for further proceedings on Mr. Lincoln's failure to accommodate claim

---

[31] In the alternative, we summarily affirm the grant of summary judgment because deficiencies in the appendix submitted by Appellants impede our ability to determine whether plumbing or pipefitting experience was a prerequisite for selection to this position or whether Mr. Lincoln had any plumbing or pipefitting experience.

67

relative to the Boilermaker position, we also remand for further proceedings on Mr. Mosbrucker's failure to accommodate claim relative to the Boilermaker position.

2. Mechanical Shop Laborer positions—applied for 3/28/13, 8/21/13, & 11/24/14

Earlier in our opinion, we concluded Mr. Mosbrucker failed to advance sufficient evidence demonstrating that the Mechanical Shop Laborer position did not entail substantial outdoor work. Further, based on Mr. Mosbrucker's failure to pass the Mechanical Aptitude Test, he has not demonstrated that he met the prerequisites for selection to the position of Mechanical Shop Laborer. Thus, summary judgment was proper with respect to Mr. Mosbrucker's failure to accommodate claim relative to his three Mechanical Shop Laborer applications.

3. Part Time Analyst/Senior Analyst position—applied for 8/31/13— & Technology Services Management Trainee position—applied for 10/10/14

Because Mr. Mosbrucker failed to raise any arguments below or on appeal regarding the merits of his failure to accommodate claim relative to these two clerk positions, he has waived and forfeited appellate review of this portion of his failure to accommodate claim. *See Bronson*, 500 F.3d at 1104; *Wilburn*, 343 F.3d at 1280.

4. Electrician Diesel Engines positions—applied for 10/10/14 & 11/26/14— & Mechanical Diesel Engines position—applied for 11/24/14

Based on Mr. Mosbrucker's failure to pass the Mechanical Aptitude Test, he has not demonstrated that he met the prerequisites for selection and was, therefore, qualified for these positions. Thus, we affirm the district court's grant of summary

judgment with respect to Mr. Mosbrucker's failure to accommodate claim relative to his two Electrician Diesel Engines applications and his Mechanical Diesel Engines application.

e. *Summation*

We affirm the district court's grant of summary judgment as to the Mechanical Shop Laborer positions to which Appellants applied. We also affirm the district court's grant of summary judgment on Mr. Lincoln's application for the Pipefitter position and Mr. Mosbrucker's applications for the Part Time Analyst/Senior Analyst, Technology Services Management Trainee, Electrician Diesel Engines, and Mechanical Diesel Engines positions. Finally, we remand Appellants' failure to accommodate claims based on their March 28, 2013, applications for the Boilermaker position and Mr. Lincoln's November 11, 2012, application for the Carman-Railcar Repair position.

## 5. ADA Retaliation Claim

a. *Standard governing claim & burden of proof framework*

"The ADA's retaliation statute provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting 42 U.S.C. § 12203(a)). Where a plaintiff relies on circumstantial evidence to establish his claim, the *McDonnell Douglas* burden-shifting framework applies. *Id.*

69

To make out a prima facie case, a plaintiff must demonstrate that "(1) []he engaged in protected opposition to discrimination; (2) a reasonable employee would have found h[is] employer's subsequent action to be materially adverse; and (3) a causal connection exists between h[is] protected activity and the employer's action." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).

The district court concluded that Appellants failed to advance sufficient evidence to sustain their burden on the causal connection element of their prima facie case. We briefly discuss the first element of the prima facie case so as to properly define the parameters of Appellants' claims and then turn to the third element of the prima facie case.

b. *Scope of claims*

An employee's request that his employer provide him an accommodation for a disability constitutes a protected activity for purposes of advancing an ADA retaliation claim. *Id.* at 1188. The first protected activity taken by both Appellants was their accommodation request letters on October 1, 2012. Thus, the same position applications that comprised their ADA failure to accommodate claims also comprise their ADA retaliation claims. *See supra* at Section III(A)(4)(c).

c. *Causal connection element*

"To establish a causal connection, [a plaintiff] must present evidence of circumstances that justify an inference of *retaliatory motive*." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (emphasis added) (internal quotation marks omitted). "The Supreme Court has likened this burden to a showing of 'but-for

70

causation.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise." *Id.* (internal quotation marks omitted).

As an initial matter, the appendix submitted by Appellants does not include the evidence upon which Appellants rely to demonstrate a causal connection between their accommodation request letters and BNSF not selecting them for open positions. Accordingly, summary affirmation of the district court's grant of summary judgment on Appellants' ADA retaliation claims is appropriate.

Even if we were to overlook the deficiencies in the appendix, however, our review of the evidence contained in the district court docket supports the district court's grant of summary judgment. Appellants argue that when Ms. Artzer interviewed them for positions, she asked a line of questions about the tank car spill accident and that her line of questions establishes a causal nexus between their accommodation requests and BNSF not selecting them for positions.[32] We fail to see such a connection.

---

[32] Although Appellants mention, in passing, that temporal proximity between a protected activity and an adverse employment action may establish a causal connection, Appellants do not develop an argument based on this statement of law. Instead, Appellants indicate only that "temporal proximity is not the only way to establish a causal nexus." *See* Appellants' Br. at 54. Accordingly, although we observe that some of the position denials occurred in close proximity to Appellants' protected activity, Appellants, by not developing a temporal proximity argument, have forfeited that argument. *See Bronson*, 500 F.3d at 1104 ("[W]e routinely have declined to consider arguments that . . . are inadequately presented, in an appellant's opening brief.").

First, Ms. Artzer testified that it was BNSF's standard interview practice to inquire whether the employee was involved in any on-site accidents and what the employee had learned about safety if he or she had been involved in an accident. If true, the fact that Ms. Artzer asked Appellants a line of questions she asks every employee applying for a position does nothing to demonstrate a causal connection between the Appellants' accommodation request letters and BNSF not selecting them for positions. And, Appellants fail to advance any evidence contradicting Ms. Artzer's testimony that she asks all interviewing employees about prior accidents.

Second, the uncontroverted evidence demonstrates that Ms. Artzer was the hiring manager for positions to which Appellants applied both before and after they submitted their accommodation request letters. Because Ms. Artzer did not select Appellants for multiple positions before Appellants submitted the accommodation request letters, it strongly suggests that something other than the accommodation request letters motivated Ms. Artzer's hiring decisions. In fact, one of the motivating factors in BNSF's decision not to select Appellants for shop positions was its conclusion that the shop positions entailed outdoor work and Appellants could not perform outdoor work. To the extent an employer "need not suspend previously planned adverse employment actions upon encountering an employee's protected activity," *Foster*, 830 F.3d at 1192 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)), BNSF did not need to alter its assessment of Appellants' abilities to work outdoors simply because Appellants submitted accommodation request letters. Therefore, although we summarily affirm the district court's grant of

summary judgment on Appellants' ADA retaliation claims, we also observe that Appellants did not direct us to evidence, within or outside of their appendix, permitting the conclusion that Appellants' protected activity was a "but-for" cause of BNSF's decisions not to select Appellants for vacant positions.

## B. *FRSA Retaliation Claims*

### 1. Exhaustion of FRSA Claims

If an employee of a railroad believes the railroad subjected him to an unfavorable personnel action due to activity protected under the FRSA, he "must first file a complaint with the Secretary of Labor within 180 days" of the unfavorable personnel action. *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 967 n.4 (8th Cir. 2017) (citing 49 U.S.C. § 20109(d)(2)(A)(ii)). "The text of [§ 20109(d)(2)] . . . makes clear that to receive relief under the FRSA, litigants must first file a complaint with [the] OSHA alleging unlawful discrimination." *Foster v. BNSF Railway Co.*, 866 F.3d 962, 966 (8th Cir. 2017). Finally, based on the 180-day time limit in § 20109(d)(2)(A)(ii), any alleged unfavorable personnel action occurring more than 180 days before an employee files an OSHA complaint is not actionable. *See Mercier v. United States Dep't of Labor, Admin. Review Bd.*, 850 F.3d 382, 388 (8th Cir. 2017) (affirming administrative law judge's dismissal of claims that occurred more than 180 days before employee filed OSHA complaint).

a. *Application as to Mr. Lincoln*

Mr. Lincoln filed his sole OSHA complaint on September 12, 2014. Thus, Mr. Lincoln properly exhausted his administrative remedies only for unfavorable

employment actions occurring between March 16, 2014, and September 12, 2014.[33] The sole position for which BNSF did not select Mr. Lincoln during that time period is the Safety Assistant position. Thus, BNSF's rejection of Mr. Lincoln for the Safety Assistant position comprises the totality of Mr. Lincoln's FRSA claim.

b. *Application as to Mr. Mosbrucker*

Mr. Mosbrucker filed OSHA complaints on November 13, 2014, and January 28, 2015. Because Mr. Mosbrucker filed his second OSHA complaint within 180 days of his first OSHA complaint, the exhaustion period stretches from 180 days before his first OSHA complaint through the date of his second OSHA complaint—May 17, 2014, to January 28, 2015. This is the exhaustion period identified in the stipulation. During that time period, Mr. Mosbrucker applied for five positions: (1) Electrician Diesel Engines—applied for October 10, 2014; (2) Technology Services Management Trainee—applied for October 10, 2014; (3) Mechanic Diesel Engines—applied for November 5, 2014; (4) Mechanical Shop Laborer—applied for November 24, 2014; and (5) Electrician Diesel Engines—applied for November 26, 2014. Thus, Mr. Mosbrucker's FRSA claim should have been comprised of BNSF denying his applications for these five positions. However, issues of waiver and forfeiture further limit Mr. Mosbrucker's FRSA claim.

In the district court, BNSF argued Mr. Mosbrucker exhausted his administrative remedies only as to the latter four of the listed positions. Mr.

---

[33] The stipulation on BNSF's motion to dismiss likewise defined the exhaustion period as "March 16, 2014 through September 12, 2014." App. App'x at 29.

74

Mosbrucker, when framing his FRSA claim in response to BNSF's motion for summary judgment, relied only on BNSF's denial of his application for the Mechanical Shop Laborer position to which he applied on November 24, 2014. The district court construed Mr. Mosbrucker's response as a concession that he had not exhausted his administrative remedies as to any of the other positions. On appeal, Mr. Mosbrucker does not challenge the district court's exhaustion determination. Accordingly, Mr. Mosbrucker has waived and forfeited his ability to advance FRSA claims on all but the Mechanical Shop Laborer position to which he applied on November 24, 2014. First, by not challenging BNSF's assertion below that he failed to exhaust his administrative remedies for the Electrician Diesel Engines position to which he applied on October 10, 2014, Mr. Mosbrucker waived his FRSA claim as to that position. *See Wilburn*, 343 F.3d at 1280 ("An issue is waived if it was not raised below in the district court."). Second, by failing, in his opening brief, to challenge the district court's holding on exhaustion as to the (1) Technology Services Management Trainee position—applied for October 10, 2014; (2) Mechanic Diesel Engines position—applied for November 5, 2014; and (3) Electrician Diesel Engines— applied for November 26, 2014, Mr. Mosbrucker has forfeited his FRSA claim as to these three positions. *See Bronson*, 500 F.3d at 1104 ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue."). Therefore, we limit our review of Mr. Mosbrucker's FRSA claim to the decision by BNSF not to select him for the Mechanical Shop Laborer position to which he applied on November 24, 2014.

## 2. Statutory Language & Framework for FRSA Claim

Under 49 U.S.C. § 20109, "[a] railroad carrier . . . may not . . . discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done . . . (4) to notify . . . the railroad carrier . . . of a work-related personal injury or work-related illness of an employee." 49 U.S.C. § 20109(a), (a)(4); *see BNSF Ry. Co. v. Cain*, 816 F.3d 628, 638 (10th Cir. 2016) (relying on § 20109(a)(4) for proposition that "[a] railroad cannot discriminate against, suspend, or discharge an employee for notifying or attempting to notify the railroad about an on-the-job injury or medical treatment for that injury"). Relative to a claimant's ability to establish a violation, the FRSA adopts the burden-shifting framework found in 49 U.S.C. § 42121(b). *See* 49 U.S.C. § 20109(d)(2)(A)(i) ("Any action brought under [the enforcement section of the FRSA] shall be governed by the legal burdens of proof set forth in section 42121(b)."). This burden-shifting framework places the initial burden on an employee to establish a prima facie case by showing that "(1) the employee engaged in a protected activity; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016) (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014)); *see Foster*, 866 F.3d at 967 (using similar language to define elements of prima facie case). "The absence of probative evidence as to any single element necessary to establish a prima facie claim

76

terminates the action." *Conrad*, 824 F.3d at 107. We now apply this framework to the present facts.

### 3. Decisionmaker's Knowledge & Retaliatory Motive

Recall that, when settlement negotiations regarding the tank car spill accident broke down, an attorney representing Appellants mailed demand letters to BNSF listing Appellants' alleged medical conditions stemming from the accident. In the district court, Appellants contended their demand letters constituted a protected activity because the letters reported to BNSF on-the-job injuries. The district court declined to analyze this contention; instead, it held that Appellants failed to establish their protected activity contributed to BNSF not selecting them for positions. The district court reached two conclusions in support of this holding: (1) Appellants failed to demonstrate that anyone involved in BNSF's hiring process knew about the demand letters; and (2) Appellants failed to demonstrate that retaliation based on the demand letters played a role in BNSF not selecting Appellants for the positions. The district court correctly focused on the decisionmaker's knowledge and motive when analyzing Appellants' FRSA retaliation claims.

Section 20109(a) of Title 49 makes it illegal for a railroad to "discriminate against an employee if such discrimination *is due*, in whole or in part, *to* the employee's lawful good faith act." (emphasis added). The section's use of "due . . . to" suggests that the protected activity must be a cause of the unfavorable personnel action. And a protected activity cannot be a cause of an unfavorable personnel action where the person or persons authorizing the unfavorable personnel action do not

77

know about the protected activity. Similarly, as the FRSA protects employees from *retaliation* for their engagement in a protected activity, *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 878 (7th Cir. 2016); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 787 (8th Cir. 2014), it follows that the decisionmaker(s) must have knowledge of the protected activity. For how can decisionmakers retaliate against an employee for taking protected activity if they do not know about the protected activity? *See Koziara*, 840 F.3d at 878 (employee must produce evidence that unfavorable personnel action was "motivated by animus"). Accordingly, we join those courts that have concluded an FRSA plaintiff advancing a retaliation claim must demonstrate the decisonmaker had knowledge of the protected activity. *See Conrad*, 824 F.3d at 107–08; *Kuduk*, 768 F.3d at 791; *see also Head v. Norfolk S. Ry. Co.*, 2017 WL 4030580, at *16 (N.D. Ala. Sept. 13, 2017) ("To show that Defendant knew of this protected activity, 'it is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression.'" (quoting *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001))); *Cyrus v. Union Pac. R.R. Co.*, 2015 WL 5675073, at *10 (N.D. Ill. Sept. 24, 2015) ("An FRSA retaliation claim cannot survive . . . absent a showing that the superiors knew he had engaged in protected activity before taking any adverse action.").

## 4. Application

In arguing they need not establish knowledge on the part of a decisionmaker to advance their FRSA claims, Appellants do not identify who the decisionmaker(s)

78

were relative to the positions that fall within their FRSA claims. As to Mr. Lincoln, because the union appointed him to the Safety Assistant position, rather than him applying for the position, the position is not included in the list of jobs to which he applied. And the declaration of the union's general chairman contained in Appellants' appendix does not specify who at BNSF rejected the appointment.[34] Without evidence regarding which individuals at BNSF decided to reject the union's appointment of Mr. Lincoln to the Safety Assistant position, we are at a loss to determine whether the decisionmaker(s) knew about the demand letter or rejected the appointment due to the demand letter. Accordingly, Mr. Lincoln failed to advance sufficient evidence to establish a prima facie claim under the FRSA, and we affirm the district court's grant of summary judgment on that claim.[35]

As to Mr. Mosbrucker, it appears that BNSF automatically rejected his application for the Mechanical Shop Laborer position because he did not pass the Mechanical Aptitude Test. Thus, not only does Mr. Mosbrucker fail to identify the

---

[34] The declaration references a Ms. Melodi Tripp and a Mr. William A. Osborn at BNSF. Mr. Lincoln, however, does not enlighten us with respect to who these two individuals are; their role in rejecting his appointment to the Safety Assistant position; or whether they had any knowledge of the demand letter.

[35] In the alternative, we summarily affirm the district court's grant of summary judgment on Mr. Lincoln's FRSA claim because the appendix submitted by Appellants does not contain any of the evidence on which Mr. Lincoln relies in an attempt to establish a causal connection. In reaching this alternative conclusion, we note that the deficiencies in the appendix are particularly problematic in this instance where Appellants' opening brief cites to district court docket entries that do not exist. *Compare* Appellants' Br. at 66 (citing "(Docket number 70-15) at 1" and "(Docket number 71-17) at 2"), *with* App. App'x at 11 (showing that docket numbers 70 and 71 each have only three attachments, none of which are communications by BNSF employees).

decisionmaker(s) (assuming that a person rather than a computer program rejected his Mechanical Shop Laborer application), an automatic rejection for not meeting a prerequisite for a position is not the type of rejection that permits an inference of a retaliatory motive. Therefore, we affirm the district court's grant of summary judgment on Mr. Mosbrucker's FRSA claim.

## IV.    CONCLUSION

Although we reverse the district court's jurisdictional ruling, we affirm the vast majority of the district court's summary judgment order. But we remand as to: (1) Appellants' ADA discrimination claims relative to the Boilermaker position to which they applied on March 28, 2013; (2) Mr. Lincoln's ADA failure to accommodate claim relative to the Carman-Railcar Repair position to which he applied on November 1, 2012, and the Boilermaker position to which he applied on March 28, 2013; and (3) Mr. Mosbrucker's failure to accommodate claim relative to the Boilermaker position to which he applied on March 28, 2013. We also vacate the district court's conclusion in Section III(A)(1)(b) of its opinion that Mr. Mosbrucker's second EEOC charge did not relate back to the date of his first EEOC charge so that the district court, if necessary, may consider additional arguments on the issue. On remand, the district court should consider what force to give the stipulation and conduct further summary judgment proceedings consistent with this opinion. Finally, based on the deficiencies in the appendix submitted by Appellants, we invoke our discretion under Federal Rule of Appellate Procedure 39(a)(4) to preclude Appellants from recovering their appellate costs and instead permit BNSF to

recover its appellate costs. In accord with Federal Rule of Appellate Procedure 39(d)(1), BNSF shall have fourteen days from entry of judgment to file any request for appellate costs.